Merrimack
No. 95-535

PAUL J. HARPER, M.D.

v.

HEALTHSOURCE NEW HAMPSHIRE, INC.

April 9, 1996

*Stanton E. Tefft*, of Bedford, on the brief and orally, for the plaintiff.

*Dean, Rice & Howard, P.A.*, of Manchester (*Mark W. Dean* and *Eric A. Kane* on the brief, and *Mr. Dean* orally), for the defendant.

*Sulloway & Hollis*, of Concord (*Martin L. Gross* on the brief), for the New Hampshire Medical Society, as *amicus curiae*.

BROCK, C.J. The plaintiff, Paul J. Harper, M.D., sued the defendant, Healthsource New Hampshire, Inc. (Healthsource), after Healthsource terminated their contractual relationship. Harper appeals from the Superior Court (*Smukler*, J.) decision granting Healthsource's motion to dismiss each of Harper's claims. We affirm in part, reverse in part, and remand.

Pursuant to our standard for reviewing rulings on motions to dismiss, we assume the following facts alleged by Harper to be true for purposes of this appeal. *See Claire Murray, Inc. v. Reed*, 139 N.H. 437, 438, 656 A.2d 822, 823 (1995). Harper is a board-certified surgeon licensed to practice medicine in New Hampshire since 1978. Healthsource is a New Hampshire health maintenance organization governed by the regulations contained in RSA chapter 420-B. Harper has been a participating physician with Healthsource, as a surgeon and as a primary care provider, since shortly after it was organized in 1985. Over the course of their ten-year relationship, Harper's patient base of between 3,000 and 4,000 people has evolved so that approximately thirty to forty percent of his patients are now Healthsource-related, either as regular subscribers, workers' compensation patients, State employees, or welfare patients covered by Healthsource medicaid payments.

In 1989, Healthsource re-enrolled Harper as a primary care physician but did not re-enroll him as a surgeon. Harper states in his writ that in June 1994, he "realized that [Healthsource] was . . . manipulating and skewing the records of treatment he had provided to several of his patients and that such inaccuracies adversely affected other subsequent reports." After Harper notified Healthsource of his concerns about the accuracy of his patients' records, Healthsource informed him that its credentialing committee had reviewed his record and found no evidence of a quality of care problem, but nevertheless was recommending that his contract be terminated because he had not satisfied its "recredentialing criteria."

Harper appealed this recommendation to the clinical quality assurance committee, requesting copies of whatever documentation the credentialing committee had relied upon to make its recommendation. *See* RSA 420-B:26, II (Supp. 1995). Healthsource refused to provide the requested material but advised Harper that he could present evidence to counter Healthsource's evidence. Harper did

not participate in the clinical quality assurance committee hearing because of Healthsource's refusal to provide him with this documentation. The committee affirmed the decision to terminate Harper for cause but also decided to terminate him without cause, which the credentialing committee had not done.

Harper appealed to the Healthsource Executive Management Committee. This group held another hearing, which Harper attended. Healthsource presented no evidence at this hearing, nor did it accede to Harper's renewed requests for access to the evidence supporting Healthsource's decision. The executive management committee upheld the clinical quality assurance committee's decision to terminate Harper's contract without cause, but did not terminate him with cause. Harper has exhausted his appeal remedies within Healthsource.

Two paragraphs of the contract between Harper and Healthsource govern the process by which their relationship can be terminated:

> 2.02 *Termination Without Cause.* This Agreement may be terminated by either party without cause upon six (6) months prior written notice.

> 2.03 *Termination With Cause.* This Agreement may be terminated immediately by [Healthsource] at any time with cause upon written notice of cause to [Harper]. Cause shall include, but not be limited to: (i) repeated failure to comply with quality assurance, peer review and utilization procedures; (ii) unprofessional conduct as determined by the appropriate state professional licensing agency; (iii) conviction for any criminal offense related to the practice of medicine or any felony unrelated to such practice; (iv) failure to meet Credentialing Committee standards and procedures; (v) revocation, reduction, or suspension of privileges at any participating provider hospital or any hospital where [Harper] conducts his principal practice; (vi) failure by [Harper] to meet the "Conditions of Participation" specified in *Section 3*; (vii) interference by [Harper] with [Healthsource]'s employer relations and business contacts; (viii) discrimination against [Healthsource] Members as described in Section 4.03; or (ix) repeated failure of [Harper] to comply with the terms of this Agreement.

Harper filed a petition in equity against Healthsource alleging numerous causes of action. The superior court granted Healthsource's motion to dismiss all of the claims. Harper appeals only four of these rulings, arguing: (1) that the "termination without

cause" provision in the agreement, or the termination in this case, is void as against public policy; (2) that Healthsource was a state actor required to afford him equal protection and due process; (3) that he properly pleaded a cause of action for civil conspiracy; and (4) that Healthsource violated RSA 420-B:26, II in refusing to provide him with certain records.

When ruling on a motion to dismiss, we consider "whether the allegations in the plaintiff's pleadings are reasonably susceptible of a construction that would permit recovery." *Claire Murray, Inc.,* 139 N.H. at 438, 656 A.2d at 823 (quotation omitted). We assume that facts asserted in Harper's pleadings are true, and construe all reasonable inferences in the light most favorable to Harper. *Id.* "If the plaintiff[] could recover upon any set of the facts under the pleadings, the motion to dismiss should be denied." *Jarvis v. Prudential Ins. Co.,* 122 N.H. 648, 651, 448 A.2d 407, 409 (1982).

*I. Termination Without Cause*

Harper contends that we should strike the provision in his agreement with Healthsource allowing Healthsource to terminate the relationship without cause as being against public policy. We construe his pleadings and appeal also to include a claim that the termination of their relationship in this case violates public policy.

The contract between Harper and Healthsource provides that the relationship can be severed by either side without cause at any time. In the pure employment context, a common law employment relationship that is terminable by either the employee or the employer at any time is referred to as "at will." *See Cloutier v. A. & P. Tea Co., Inc.,* 121 N.H. 915, 919, 436 A.2d 1140, 1142 (1981). Like most courts, we have carved out exceptions to the common law employment-at-will doctrine, noting that in some cases "the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two." *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 133, 316 A.2d 549, 551 (1974); *see, e.g., Lampe v. Presbyterian Med. Center,* 590 P.2d 513, 514-15 (Colo. Ct. App. 1978); *Wieder v. Skala,* 609 N.E.2d 105, 109-10 (N.Y. 1992).

■ ■ Strictly speaking, Harper's relationship with Healthsource is not an employer-employee relationship. Healthsource does not control, and has no right to control, the manner of performance of Harper's duties, for example. *See Boissonnault v. Bristol Federated Church,* 138 N.H. 476, 478, 642 A.2d 328, 329 (1994). Nor is Harper really an independent contractor for Healthsource, in the

way that employment cases treat such a relationship. *See Merchants Ins. Group v. Warchol*, 132 N.H. 23, 27-28, 560 A.2d 1162, 1165 (1989). Harper's status as a "preferred provider" of health care for Healthsource's customers means that Healthsource will pay for services he renders to his patients who are also Healthsource customers.

■ The trial court treated Harper as making only a wrongful termination of employment argument and applied the legal standards applicable in the employment context. *See Cloutier*, 121 N.H. at 920, 436 A.2d at 1143 (in order to make wrongful termination of employment claim, plaintiff must prove an employment relationship). Although the relationship in this case is similar to an employment relationship, this was error. Additionally, we reject Healthsource's contention that Harper's petition only alleged such an employment argument. Harper's claim was broad enough to encompass the issue we decide today.

We will not enforce a contract or contract term that contravenes public policy. *See, e.g., Audley v. Melton*, 138 N.H. 416, 418, 640 A.2d 777, 779 (1994); *Technical Aid Corp. v. Allen*, 134 N.H. 1, 8, 17, 591 A.2d 262, 265-66, 271 (1991).

> An agreement is against public policy if it is injurious to the interests of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society and is in conflict with the morals of the time.

17A AM. JUR. 2D *Contracts* § 263, at 267-68 (1991) (footnotes omitted). The public policy to which a court may refer may be statutory or nonstatutory in origin. *Cloutier*, 121 N.H. at 922, 436 A.2d at 1144.

The implied covenant of good faith and fair dealing is an example of a common law application of public policy to contract law. *See Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 139-40, 562 A.2d 187, 191 (1989). "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979); *see Douglas v. Company*, 81 N.H. 371, 378, 127 A. 708, 712 (1924). In New Hampshire, we have "not merely one rule of implied good faith duty[,] but rather a series of doctrines, each of them serving markedly different functions." *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 293, 608 A.2d 840, 855 (1992) (quotation, brackets, and ellipses omitted). The obligation to act in good faith in employment termination cases

> is an obligation implied in the contract itself, where it fulfills the . . . function of limiting the power of an employer to terminate a wage contract by discharging an at-will employee. . . . [A]n employer violates an implied term of a contract for employment at-will by firing an employee out of malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy.

*Centronics Corp.*, 132 N.H. at 139-40, 562 A.2d at 191. The good faith covenant must be applied in light of the contemplation of the parties at the time they formed the contract.

> Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

RESTATEMENT (SECOND) OF CONTRACTS § 205 comment a, at 100; *see Bak-A-Lum Corp. of America v. Alcoa Bldg. Prod.*, 351 A.2d 349, 352 (N.J. 1976).

We have applied public policy concerns to the health care arena before. *Bricker v. Sceva Speare Hosp.*, 111 N.H. 276, 279, 281 A.2d 589, 592, *cert. denied*, 404 U.S. 995 (1971). In *Bricker*, we observed that "the public has a substantial interest in the operation of private hospitals and that of necessity in the public interest some measure of control by the courts is called for." *Id.*

■■ The public has a substantial interest in the relationship between health maintenance organizations and their preferred provider physicians as well. *See* N.H.H.R. JOUR. 1135-36 (1996) (describing access to health care at a competitive price via health maintenance organizations as a "broad, generalized social and economic problem of great importance to New Hampshire citizens"). This relationship is perhaps the most important factor in linking a particular physician with a particular patient. As Harper correctly notes, the termination of his relationship with Healthsource affects more than just his own interest.

Several relationships in our society stand on a different footing from the rest. The most visible are those between wife and husband, lawyer and client, pastor and penitent, and physician and patient. In these relationships, society values truthfulness in communication above other competing interests, such as evidence in the search for truth in legal actions. *See, e.g.*, N.H. R. EV. 503 (evidentiary

privilege for communication between physician and patient). Evidentiary privileges protect communication within these relationships from being revealed in litigation because society has determined that the relationship "ought to be sedulously fostered," and that "[t]he injury that would inure to the relation by the disclosure of the communications [is] greater than the benefit thereby gained for the correct disposal of litigation." 8 J. WIGMORE, EVIDENCE § 2285, at 527 (McNaughton rev. 1961) (emphasis omitted).

█ RSA chapter 420-C creates some parameters for preferred provider agreements between health insurers and physicians, similar to the one in this case. *See, e.g.*, RSA 420-C:5-a (Supp. 1995) (prohibiting health care insurers from limiting their liability in preferred provider agreements for actions of physicians). In RSA 420-C:1 (1991), the legislature stated the general policy behind the chapter, that is, that preferred provider agreements must be "fair and in the public interest." We conclude that the public interest and fundamental fairness demand that a health maintenance organization's decision to terminate its relationship with a particular physician provider must comport with the covenant of good faith and fair dealing and may not be made for a reason that is contrary to public policy. *See Monge*, 114 N.H. at 133, 316 A.2d at 551; *Bricker*, 111 N.H. at 279, 281 A.2d at 592; *cf. Ezekial v. Winkley*, 572 P.2d 32, 38-39 (Cal. 1977) (construing state common law right to fair procedures in relationships affecting substantial economic interests).

█ █ A terminated physician is entitled to review of the termination decision under this standard, whether the termination was for cause, or without cause. This rule does not eliminate a health maintenance organization's contractual right to terminate its relationship with a physician without cause. *Cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) (certain contract terms reviewable for fundamental fairness, but are not declared unfair and rendered ineffective in all cases). If a physician's relationship, however, is terminated without cause and the physician believes that the decision to terminate was, in truth, made in bad faith or based upon some factor that would render the decision contrary to public policy, then the physician is entitled to review of the decision.

Harper is entitled to proceed upon the merits of his claim that Healthsource's decision to terminate its relationship with him was made in bad faith or violated public policy. In his petition, he asserted that his efforts to correct errors made in patient records played a role in Healthsource's decision, and he argues on appeal that public policy should condemn "an insurance company which,

upon receipt of a letter from a medical provider asking for assistance in correcting . . . records of patient treatments, terminates the doctor's services."

## II. Due Process

■ ■ Harper next contends that the trial court erred in dismissing his claim under 42 U.S.C. § 1983 (1988), arguing that the termination decision deprived him of a protected property right without due process under the United States Constitution. U.S. CONST. amend. V, XIV. We disagree.

Harper is entitled to due process protection only if he can demonstrate that Healthsource was a state actor when it terminated the relationship. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). Due process affords no shield against private conduct "no matter how unfair that conduct may be." *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988). Harper's position is that by virtue of having undertaken to provide services to New Hampshire citizens on behalf of the State such as welfare medical benefits and State employee workers' compensation benefits, Healthsource stands in the State's shoes in all of its actions. This position is contrary to established law. *See Jerry's Sport Center, Inc. v. Novick*, 122 N.H. 636, 638, 448 A.2d 404, 406 (1982).

> [T]he question is whether the State was sufficiently involved [in the private conduct] to treat that decisive conduct as state action. This may occur if the State creates the legal framework governing the conduct; if it delegates its authority to the private actor; or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior. Thus, in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.

*Tarkanian*, 488 U.S. at 192 (citations and footnote omitted). To proceed successfully with such a claim, Harper must demonstrate more than an ongoing relationship between the State and Healthsource on various matters. Harper must demonstrate that the two were intertwined with regard to the challenged action. *See Jackson*, 419 U.S. at 351 (requiring a "sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself"). He has not alleged such a relationship with regard to the termination decision itself. *Compare West v. Atkins*, 487 U.S. 42, 54-57 (1988) (physician who contracted to treat prison inmates on a part-time basis deemed state actor when treating inmates) *with*

*Polk County v. Dodson*, 454 U.S. 312, 318 (1981) (although paid by the State, public defender ordinarily an adversary to the State, and not state actor). On the facts alleged, the trial court properly found no state action and properly dismissed this claim.

### III. RSA 420-B:26 Claim

In his petition, Harper sought damages from Healthsource for failing to provide him with the records utilized in making its decision to terminate their relationship. Harper sought this relief under RSA 420-B:26, which creates a privilege in the records of quality assurance programs within health maintenance organizations. *See* RSA 420-B:26, II. We affirm the trial court dismissal of this claim for damages without prejudice to any subsequent discovery requests that may be made in this action.

In their briefs on appeal, the parties argue whether an exception to the privilege created in RSA 420-B:26, II may apply to require Healthsource to release the quality assurance records. *See* RSA 420-B:26, II(a). This issue was not before the trial court, although it may arise upon remand. We note that there are occasions in which even the most sacred of privileges must fall, such as when there is no available alternative source for the information and there is a "compelling need for the information." *McGranahan v. Dahar*, 119 N.H. 758, 764, 408 A.2d 121, 125 (1979); *see State v. Whittey*, 134 N.H. 736, 739, 599 A.2d 117, 119 (1991).

We have considered Harper's argument that the trial court erred in dismissing his civil conspiracy claim, but conclude that it is meritless. *See Vogel v. Vogel*, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

*Affirmed in part; reversed in part; remanded.*

BRODERICK, J., did not sit; BATCHELDER, J., retired, sat by special assignment under RSA 490:3 (1983); all who sat concurred.