BROWN, J.
I dissent. With its decision today, the majority, in effect, declares that it is the public policy of this state that physicians are entitled to a minimum income and, therefore, if removal of a physician from an *1074 insurer’s preferred provider list would reduce the physician’s income below that guaranteed minimum, the physician is entitled to a hearing and to the judicial review that would inevitably follow upon an adverse decision. What is the majority’s authority for declaring this public policy, for singling out physicians for such special treatment? Only recently this court reaffirmed its commitment to the principle that, “aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state. [Citations.]” (Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66, 71 [78 Cal.Rptr.2d 16, 960 P.2d 1046] (Green).) Therefore, one would assume, the Legislature must have spoken on this question, and the majority is simply implementing the public policy declared by the Legislature. That assumption would be mistaken, however. The majority relies, instead, on the common law for its asserted authority to declare public policy on this question. This in spite of the fact that “it is generally agreed that ‘public policy’ as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, Test they mistake their own predilections for public policy which deserves recognition at law.’ (Hentzel v. Singer Co. [(1982)] 138 Cal.App.3d 290, 297 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015].)” (Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, 1095 [4 Cal.Rptr.2d 874, 824 P.2d 680].)
In consulting its own predilections, the majority once again invokes the expansive and expansible doctrine this court has constructed upon the common law right of fair procedure. This court traces the modem origins of its common law right of fair procedure to our opinion in James v. Marinship Corp. (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] (Marinship). (Ezekial v. Winkley (1977) 20 Cal.3d 267, 271 [142 Cal.Rptr. 418, 572 P.2d 32] (Ezekial); Pinsker v. Pacific Coast Society of Orthodontists (1974) 12 Cal.3d 541, 551 [116 Cal.Rptr. 245, 526 P.2d 253].) We must, therefore, closely examine Marinship before going on to discuss the other errors in the majority’s analysis.

The Majority’s Reliance on Marinship Is Misplaced

The majority’s reliance on Marinship is misplaced for three reasons;
(1) Marinship did not involve the common law right of fair procedure. That right has been defined by this court as including adequate notice of the charges and a reasonable opportunity to respond. (Ezekial, supra, 20 Cal.3d at p. 272.) In Marinship, a union with a closed shop agreement discriminated against applicants on the basis of race. This court did not say that such discrimination was unobjectionable so long as the union gave applicants *1075 notice and an opportunity to respond to the “charge” of belonging to a racial minority. Rather, we held that “an arbitrarily closed or partially closed union is incompatible with a closed shop” (Marinship, supra, 25 Cal.2d at p. 731), with the result that “Negroes must be admitted to membership under the same terms and conditions applicable to non-Negroes unless the union and the employer refrain from enforcing the closed shop agreement against them.” (Id. at p. 745.)
The common law right extended in Marinship, therefore, was not the right to fair procedure, but the right to service. “It was well established at common law that innkeepers and common carriers were under a duty to furnish accommodations to all persons, in absence of some reasonable ground [citations], and if colored persons are furnished separate accommodations they must be equally safe, commodious and comfortable. [Citations.] The analogy of the public service cases not only demonstrates a public policy against racial discrimination but also refutes defendants’ contention that a statute is necessary to enforce such a policy where private rather than public action is involved.” (Marinship, supra, 25 Cal.2d at p. 740.)
(2) The fact that the union in Marinship exercised monopoly power was important to our decision in that case. “Where a union has, as in this case, attained a monopoly of the supply of labor by means of closed shop agreements and other forms of collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations. ... Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living. [Citations.]” (Marinship, supra, 25 Cal.2d at p. 731.)
Historically, the common law duty to serve arose in response to the fact that in the 15th century those engaged in certain public callings, for example, innkeepers and carriers, exercised virtual monopolies. “When the weary traveller reaches the wayside inn in the gathering dusk, if the host turn him away what shall he do? Go on to the next inn? It is miles away, and the roads are infested with robbers. The traveller would be at the mercy of the innkeeper, who might practice upon him any extortion, for the guest would submit to anything almost, rather than be put out into the night.” (Wyman, The Law of the Public Callings as a Solution to the Trust Problem (1904) 17 Harv. L.Rev. 156, 159.) And the existence of monopoly power is a requisite of not only the common law right to service, but also of the common law right of fair procedure. “Forgoing repetitious analysis of cited cases [finding a common law right of fair procedure], I can safely assert that in every authority relied upon by the majority there was an element of monopoly *1076 control of the professional practice involved.” (Ezekial, supra, 20 Cal.3d 267, 281 (dis. opn. of Mosk, J.).)
Certainly in Pinsker v. Pacific Coast Soc. of Orthodontists (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] (Pinsker I), this court’s decision was bottomed on the monopoly control the American Association of Orthodontists (AAO) exercised over the field of orthodontics. “Because of the unique position in the field of orthodontics occupied by defendant AAO and its constituent organizations, membership therein, although not economically necessary in the strict sense of the word . . . , would appear to be a practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty. Defendant associations hold themselves out to the public and the dental profession generally as the sole organizations recognized by the ADA, which is itself a virtual monopoly, to determine standards, both ethical and educational, for the practice and certification of orthodontics. Thus, a public interest is shown, and the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications.” (Id. at p. 166.)
Although the majority in Ezekial stated that “the application of the common law rule [of fair procedure] does not depend on the existence of ‘monopoly’ power” (Ezekial, supra, 20 Cal.3d at p. 277), what this court actually found was that Kaiser Foundation Hospital’s termination of the plaintiff from its surgical residency program meant that he would never be able to practice as a surgeon at any other accredited hospital in California. “Dismissal from Kaiser will, as a practical matter and because of Kaiser’s close relationship with other teaching hospitals, prevent plaintiff’s acceptance in any other surgical residency program. Successful completion of an approved surgical residency is a prerequisite to attainment of the status of a ‘board certified general surgeon,’ without which plaintiff cannot practice a surgical specialty in any accredited California hospital.” (Id. at pp. 270-271.) From the plaintiff’s point of view, that was certainly tantamount to the exercise of monopoly power.
If, in Ezekial, the doctrine this court had constructed on the common law right of fair procedure began to slip from its moorings in monopoly power, it is now entirely adrift. Under the standard announced by the majority today, an insurer need not exercise monopoly power before the burdens of the common law right of fair procedure are imposed on it. Rather, as I explain below, it is sufficient if the insurer has any significant share of a regional market.
(3) Marinship, unlike the majority’s decision in this case, is consistent with our long-held principle that, “aside from constitutional policy, the *1077 Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state.” (Green, supra, 19 Cal.4th at p. 71.) Marinship can be squared with this principle because the ultimate source of the public policy announced there was the federal Constitution. “The discriminatory practices involved in this case are, moreover, contrary to the public policy of the United States and this state. The United States Constitution has long prohibited governmental action discriminating against persons because of race or color. (5th, 14th, and 15th Amendments.)” (Marinship, supra, 25 Cal.2d at p. 739.)
Because the right vindicated in Marinship was transparently clear and transcendingly important, a right of constitutional stature, this court did not feel compelled to await action by the Legislature. “Some courts have held that state legislation is necessary in order to announce a public policy restricting a union’s right to arbitrarily exclude individuals from membership although as a result thereof excluded persons are unable to find employment in their chosen trade. [Citations.] As said hereinbefore, however, other authorities have indicated that the courts, without statutory aid, may restrain such conduct by a union on the ground that it is tortious and contrary to public policy. Further, as said in 4 Restatement, Torts, page 136, comment to section 794: ‘The expression of public policy is not confined to legislation and criminal law; in passing upon the propriety of an object [of concerted labor action], public policy otherwise defined is an important factor. If the object is an act against which the law has definitely set its face, it is not a proper object of concerted action.’ ” (Marinship, supra, 25 Cal.2d at p. 734.)
History has confirmed this court’s judgment that the racial discrimination practiced by the union in Marinship was “an act against which the law has definitely set its face.” (Marinship, supra, 25 Cal.2d at p. 734.) However, it trivializes Marinship to suggest that anything like the same degree of public policy consensus has developed with regard to the question at bar. According to Dr. Potvin, the average physician who practices his specialty, obstetrics/gynecology, has been sued for malpractice 2.3 times. Metropolitan Life Insurance Company (MetLife) wishes to restrict its preferred provider lists to physicians with a slightly better than average malpractice history, to those who have not been sued more than twice. Potvin, by contrast, has been sued four times—nearly twice the average. (Maj. opn., ante, at pp. 1064-1065.) Now the majority’s public policy antennae may be more sensitive than mine, but I suspect the jury is still out on the question of whether an insurer should be able to control its costs by restricting its preferred provider lists to physicians with slightly better than average malpractice histories. That, surely, is a business judgment, and if the insurer makes the wrong judgment by depriving itself of doctors that patients insist upon, then the market will punish the insurer and force it to retreat from the impracticable standard.
*1078 Far from having identified a practice “against which the law has definitely set its face” (Marinship, supra, 25 Cal.2d at p. 734), the majority condemns today what the Legislature is as likely as not to approve tomorrow. Indeed, in the 1995-1996 (Assem. Bill No. 3226) and 1997-1998 (Assem. Bill. No. 434) legislative sessions, attempts were made to pass laws granting physicians the sorts of procedural rights they receive under the majority opinion, and those bills failed. Colorado did recently pass legislation on this subject, but the Colorado Legislature must have consulted a different public policy oracle than did the majority of this court, for the Colorado statute permits a provider of health coverage to terminate a contract with a physician without cause so long as the notice requirements are the same for both parties. (Grossman v. Columbine Med. Group (Colo.Ct.App., Nov; 12, 1999, No. 98CA0668) 1999 WL 1024015, 1999 Colo.App. Lexis 286.)

The Standard Announced by the Majority Is Unworkable

Under the standard announced by the majority, an insurer’s obligation to provide a hearing to a physician removed from one of its preferred provider lists “arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest.” (Maj. opn., ante, at p. 1071, fn. omitted.) Loss of income by the delisted physician, the majority adds, would be relevant insofar as it tended to prove that termination would “generally reduce physician income so significantly as to impair the ability to practice medicine.” (Maj. opn., ante, at p. 1072.)
My initial objection to the majority’s standard is that it simply makes no sense. There is no necessary relationship between a physician’s income and a physician’s ability to practice medicine. Did Albert Schweitzer’s ability to practice medicine diminish along with his income when he became a medical missionary in Africa?
Moreover, despite the majority’s effort to cloak it in the public interest, this case has never been about Dr. Potvin’s ability to practice medicine. It has been about money. In his initial correspondence with MetLife concerning his termination, Potvin expressed his grievance in strictly economic terms. “In this financial climate my being terminated from this program impedes to a degree my ability to make a living.” In a letter written to MetLife a year later, Potvin reiterated that the termination “is causing me financial grief.” In the complaint, which was filed a year after that, Potvin did not allege that his ability to practice medicine had been impaired, but rather that he had “lost a substantial amount of income, and will continue to *1079 lose substantial income each month.” Finally, in moving for summary adjudication, Potvin repeated that the termination was causing him “financial grief.” As far as we can tell from this record, during the three and a half years that passed between his initial correspondence with MetLife and the filing of his motion for summary adjudication, Potvin’s ability to practice medicine and his medical specialty were unaffected. He just was not making as much money at it.
Now I am not saying that it is somehow unbecoming for physicians to be concerned about loss of income. What I am saying is that this court has made doctors a protected class. Until the economy turned around recently, one could hardly open a newspaper without reading of yet another company that had laid off thousands of its employees. However, no one suggested that textile workers or bank employees, for example, had a right to a hearing before losing their jobs. The layoffs certainly affected “important, substantial economic interest^]” of theirs. (Maj. opn., ante, at p. 1071.) Indeed, they may well have exhausted their savings and lost their homes. And yet textile workers and bank employees must fend for themselves, while doctors are treated by the majority as if they are entitled to a minimum income.
The standard announced by the majority is unworkable, too, in the sense that decisions under it will be unpredictable. As a consequence, insurers will be forced to forgo cost-cutting measures like MetLife’s malpractice policy, or be prepared to grant hearings to all physicians terminated under such policies. The majority’s standard purports to draw distinctions based on an insurer’s share of the market in a particular geographic area. However, an insurer with any significant share of such a market will not be able to predict with confidence whether it would be found to possess “power so substantial” (maj. opn., ante, at p. 1071) that termination from its preferred provider lists would “significantly impair[] the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area.” (Ibid.) In theory, a physician in Riverside might be entitled to a hearing before being terminated by a given insurer, while a physician in Fremont might not be, but as a practical matter, denying the Fremont physician a hearing would only result in expensive litigation with an uncertain outcome, so the insurer will be forced to give them both hearings. Or, more likely, the insurer will simply give up on its cost-cutting efforts as not worth the candle because, as Justice Mosk pointed out in his dissent in Ezekial, “there will inevitably be constant court challenges to the nature of the ‘fair hearing.’ ” (Ezekial, supra, 20 Cal.3d 267, 282 (dis. opn. of Mosk, J.).) That such an outcome, the abandonment of cost-control measures, would be in the public interest is certainly debatable, as inflation of health care costs is one of the greatest public policy challenges of our day. As Justice Mosk also pointed *1080 out in his dissenting opinion in Ezekial, “[w]hen we are importuned to judicially expand a common law concept we cannot overlook policy considerations and the practical repercussions.” (Id. at p. 283.)
The scope of the majority’s opinion is also unclear. The majority insists that “[o]ur decision here does not apply to employer-employee contractual relations. Rather, it applies only to an insurer’s decision to remove individual physicians from its preferred provider lists.” (Maj. opn., ante, at p. 1071, fn. 2.) However, employers will not be comforted, for why would the majority’s opinion not apply to employer-employee contractual relations? Ezekial involved such relations. (See Ezekial, supra, 20 Cal.3d at p. 275; id. at p. 276 [“plaintiff, as a resident, is also necessarily an employee of the hospital”].) Moreover, assuming for the sake of argument that its opinion does not apply to employer-employee contractual relations, the majority will have created the anomalous situation that MetLife would have greater obligations to independent contractors like Potvin than to its own employees. For that matter, why would the majority’s opinion not apply to the admission to, as well as the removal of physicians from, an insurer’s preferred provider lists? After all, Pinsker involved admission to membership in national and state associations of orthodontists. A “public interest” having been shown, “the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications.” (Pinsker I, supra, 1 Cal.3d at p. 166, italics added.)

The “Without Cause” Termination Provision in Dr. Potvin’s Contract with MetLife Should Be Enforced

Dr. Potvin’s contract with MetLife provided that it could be terminated by either party “ ‘at any time, with or without cause, by giving thirty (30) days prior written notice to the other party’ ” (maj. opn., ante, at p. 1064), and MetLife properly invoked that provision in terminating Potvin’s preferred provider status. Therefore, as the majority notes, MetLife contends that even if removal of a physician from its preferred provider lists is subject to the common law right to fair procedure, Potvin waived that right by agreeing that MetLife could terminate the preferred provider arrangement without cause. In rejecting this contention, the majority declares the “without cause” termination provision of Potvin’s contract with MetLife “unenforceable to the extent it purports to limit an otherwise existing right to fair procedure under the common law.” (Maj. opn., ante, at p. 1073.)
The analytical journey by which the majority comes to this remarkable conclusion is as abrupt as it is misconceived. After citing one out-of-state *1081 case, the majority contents itself with the observation that “California courts, too, are loathe to enforce contract provisions offensive to public policy. (Kreamer v. Earl (1891) 91 Cal. 112, 117 [27 P. 735] [‘ “No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication.’”]; accord, Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 381 [33 Cal.Rptr.2d 63, 878 P.2d 1275].)” (Maj. opn., ante, at p. 1073.)
To the contrary: “Historically, this court has been reluctant to declare contractual provisions void or unenforceable on public policy grounds without firm legislative guidance.” (Santisas v. Goodin (1998) 17 Cal.4th 599, 621 [71 Cal.Rptr.2d 830, 951 P.2d 399].) Insofar as the Legislature has provided guidance on the subject of at-will termination provisions, and it has in the context of employment contracts, it has made such provisions generally enforceable. “An employment, having no specified term, may be terminated at the will of either party on notice to the other.” (Lab. Code, § 2922.) In Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], this court created a narrow exception to this rule by recognizing that an employer’s right to discharge an at-will employee is subject to limits that fundamental public policy imposes. However, as we subsequently explained, employees who assert Tameny claims must show that the important public interests they seek to protect are “tethered to fundamental policies that are delineated in constitutional or statutory provisions.” (Gantt v. Sentry Insurance, supra, 1 Cal.4th at p. 1095 (Gantt).) The reason for our reticence is clear. “[T]he policy of the state is not created by the judicial department, although the judicial department may be called upon at times to declare it; it can be ascertained only by reference to the constitution and laws passed under it, or, which is the same thing, to the principles underlying and recognized by the constitution and laws.” (Lux v. Haggin (1886) 69 Cal. 255, 307-308 [10 P. 674].) “[M]any courts have cautioned against recklessness in condemning contracts as being against public policy. Thus it has been said by an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths.” (Southern Pacific R. R. Co. v. Stibbens (1930) 103 Cal.App. 664, 680 [285 P. 374].)
So what authority does the majority rely upon in impliedly repudiating this cardinal principle of judicial restraint? A 110-year-old case—Kreamer v. Earl, supra, 91 Cal. 112 (Kreamer). Actually, Kreamer looked to the Constitution and statutes of this state in determining that it would be contrary to public policy to enforce a land sale contract. The contract was in contravention of the state constitutional provision that “ ‘lands belonging to this state which are suitable for cultivation shall be granted only to actual settlers, and *1082 in quantities not exceeding 320 acres to each settler.’ ” (Id. at pp. 117-118.) “There is no doubt that the contract contravenes the spirit and policy of the land laws of this state. . . . It is not necessary that the act itself, or any other act, should declare in express words such a contract to be void. If, upon a review of all the state legislation upon the subject, such a contract appears to contravene the design and policy of the laws, a court of equity will not enforce it.” (Id. at pp. 116-117.) It was in this context that the Kreamer court made the statement upon which the majority relies. “ ‘No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication.’ (Damrell v. Meyer [(1870)] 40 Cal. [166,] 170.)" (Id. at p. 117.) Parenthetically, I do not tax the majority with the error, but as a matter of editorial curiosity, the statement that the Kreamer court purports to quote from Damrell v. Meyer nowhere appears in Damrell. More substantively, I note that Damrell refused to enforce a contract that it found to be “in direct contravention of the express provision of the Pre-emption Act.” (Damrell, supra, 40 Cal. at p. 170.) Damrell, then, like Kreamer, is perfectly consistent with the principle that the majority now repudiates—that a court should not refuse to enforce a contract as being contrary to public policy unless that policy is clearly expressed in constitutional or statutory provisions.
The out-of-state case upon which the majority relies is Harper v. Healthsource New Hampshire (1996) 40 N.H. 770 [674 A.2d 962] (Harper). (Maj. opn., ante, at p. 1073.) Upon examination, Harper provides little support for the majority’s refusal to enforce the “without cause” termination clause of Potvin’s contract with MetLife. Harper is distinguishable because California law differs from New Hampshire’s in three respects that are critical to the decision in that case. First, the New Hampshire Supreme Court has “carved out exceptions to the common law employment-at-will doctrine, noting that in some cases ‘the employer’s interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public’s interest in maintaining a proper balance between the two.’ [Citations.]” (Harper, supra, 674 A.2d at pp. 964-965.) In California, on the other hand, the common law employment-at-will doctrine has been reinforced by statute (Lab. Code, § 2922), and this court has not “carved out” the exception upon which the Harper court relied. Second, in New Hampshire “[t]he public policy to which a court may refer [in refusing to enforce a contract] may be statutory or nonstatutory in origin.” (Harper, supra, 674 A.2d at p. 965.) By contrast, this court, as I have just.explained, is generally “reluctant to declare contractual provisions void or unenforceable on public policy grounds without firm legislative guidance” (Santisas v. Goodin, supra, 17 Cal.4th at p. 621), and we have specifically held that exceptions to the employment-at-will doctrine must be “tethered to fundamental policies that are delineated in constitutional or statutory provisions” *1083 (Gantt, supra, 1 Cal.4th at p. 1095). Third, Harper relied upon an expression of policy by the New Hampshire Legislature “that preferred provider agreements must be ‘fair and in the public interest.’ ” (Harper, supra, 674 A.2d at p. 966.) No similar expression of policy by the California Legislature has been brought to our attention.
Finally, the Harper court emphasized that the rule it was declaring “does not eliminate a health maintenance organization’s contractual right to terminate its relationship with a physician without cause.” (Harper, supra, 674 A.2d at p. 966.) Rather, under the Harper rule, a physician terminated pursuant to a “without cause” provision is entitled to review only if “the physician believes that the decision to terminate was, in truth, made in bad faith or based upon some factor that would render the decision contrary to public policy.” (Ibid.) Indeed, under the Harper rule, the “without cause” termination provision of MetLife’s contract with Dr. Potvin should be enforced because there is no showing that MetLife’s decision was “made in bad faith or based upon some other factor that would render the decision contrary to public policy.” (Ibid.)
Certainly it is not contrary to public policy for a business enterprise to seek to minimize its costs. Any successful business must do so, and in this era of spiraling health care costs, health care providers have a special societal responsibility to do so. (In enacting the Knox-Keene Health Care Service Plan Act of 1975 (Stats. 1975, ch. 941, § 2, p. 2071), for example, the Legislature stated that one of its goals was providing “the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers.” (Health & Saf. Code, § 1342, subd. (d), italics added.)) For a medical insurer, physician services are one of its principal costs, and for physicians, malpractice insurance is one of their principal costs. Therefore, to be competitive, a medical insurer would be wise to restrict its preferred provider lists to physicians with better than average malpractice histories, and, by his own admission, Dr. Potvin’s malpractice history was considerably worse than average.
In conclusion, the judgment of the trial court granting MetLife’s motion for summary judgment should have been affirmed.
Baxter, J., and Chin, J., concurred.
Respondent’s petition for a rehearing was denied June 28, 2000. Baxter, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.