PANNOZZO, M.D., Appellant,

v.

ANTHEM BLUE CROSS AND BLUE SHIELD et al., Appellees.

[Cite as *Pannozzo v. Anthem Blue Cross & Blue Shield,*
152 Ohio App.3d 235, 2003-Ohio-1601.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 02 CA 112.

Decided March 25, 2003.

236

---

John Falgiani and Mark Colucci, for appellant.

James Burns and Bruce Batista, for appellees.

VUKOVICH, Judge.

{¶ 1} Plaintiff-appellant Anthony Pannozzo, M.D., appeals from the judgment of the Mahoning County Common Pleas Court, which granted the motion to dismiss filed by defendants-appellees Anthem Blue Cross and Blue Shield and Kevin Nash, M.D. The main issue before us concerns whether appellant has common-law rights to notice and an opportunity to be heard concerning his alleged removal from a health insurer's preferred provider list. Appellant basically admits that Ohio law is against him on this issue and argues that Ohio should adopt the holding set forth in a California Supreme Court case. For the following reasons, the judgment of the trial court is affirmed.

## STATEMENT OF THE CASE

{¶ 2} On November 14, 2001, Dr. Pannozzo filed a complaint against Anthem and Dr. Nash. The complaint noted that Dr. Pannozzo operates a rehabilitation clinic in Mahoning County and that he has had medical provider agreements with Anthem for ten years. Initially, six causes of action were outlined: (1) breach of express and implied contract with a violation of the duty of good faith and fair dealing by Anthem's failure to renew the contract without justification; (2) violation of fair procedure alleged to be a breach of contract by Anthem; (3) promissory estoppel and detrimental reliance with regard to Anthem; (4) tortious interference with a contract with regard to the decision of Dr. Nash, Anthem's agent who allegedly recommended nonrenewal of the agreement; (5) federal and state antitrust violations involving both defendants; and (6) a request for injunctive relief. The case was removed to federal court but was returned after Dr. Pannozzo filed an amended complaint on April 2, 2002, omitting his fifth cause of action.

{¶ 3} Attached to the complaint was Exhibit A, an agreement signed with Anthem on December 18, 2000, by Dr. Pannozzo as the owner of Physiatrist Associates of Youngstown, Inc. The agreement was to continue in effect for one year and automatically renew for consecutive one-year terms unless terminated as provided therein. Either party could terminate the agreement at any time during the initial term or thereafter, without cause, by giving 90 days' written notice. In case of default, the defaulting party has 30 days from the written notice to cure the default. The agreement also provided for automatic and immediate termination under certain circumstances. The agreement called for dispute resolution of issues arising out of the agreement except in cases involving medical malpractice or termination without cause.

{¶ 4} On April 19, 2002, defendants filed a motion to dismiss the complaint under Civ.R. 12(B)(6) for failure to state a claim, along with a memorandum in

support. First, the memorandum avers that Anthem is actually Community Insurance Company, d.b.a. Anthem Blue Cross and Blue Shield. Second, the movants-defendants contend that the contract attached to Dr. Pannozzo's complaint is the new and existing traditional provider agreement rather than the preferred provider agreement under which Dr. Pannozzo previously operated and under which he is actually suing. For comparison, defendants attached a copy of the prior agreement. Defendants also cite law providing that documents referred to, but not attached to, plaintiff's complaint can be submitted by the defendant and considered by the court. The prior preferred provider agreement was to last for three years and automatically expire on December 31, 2000, unless otherwise terminated. There was no provision for automatic renewal. This agreement also allowed for termination without cause during the initial term.

{¶ 5} Defendants' memorandum expressed their belief that Dr. Pannozzo seeks to require Anthem to do business with him on the terms of his choosing, i.e., as a preferred provider under the prior contract. Defendants explain that Dr. Pannozzo is suing them for nonrenewal of the terms of the old contract rather than nonrenewal of the terms of the most recent contract. In fact, defendants state that Dr. Pannozzo is still acting under the most recent contract as a traditional provider.

{¶ 6} Yet a reading of the complaint leads the reader to believe that Anthem failed to renew the contract that was attached to the complaint, thus leaving Dr. Pannozzo without a contract for the year 2002. Regardless, Dr. Pannozzo's response to defendants' dismissal motion explicitly concedes that he "concurs with the basic facts as summarized by the Defendant" and "concurs with Defendants' recital of the basic facts * * *." He thus agrees that his claim revolves around the allegedly wrongful nonrenewal of his former contract and that the remedy he seeks is reinstatement of his rights as a preferred provider under the former contract.

{¶ 7} Returning to defendants' memorandum, multiple reasons in support of dismissal are discussed. With reference to the breach-of-contract claim, defendants state that the contract attached to the complaint does not entitle Dr. Pannozzo to preferred provider status on its face. An integration clause in this contract specifically states that the agreement is the entire understanding between the parties, superseding all prior oral and written contracts. Defendants note that the prior contract is expired and that it contained a termination-without-cause clause. Defendants then cite a case from the First Appellate District that affirmed the dismissal of a physician's challenge of Anthem's termination without cause of the provider relationship. *Sammarco v. Anthem Ins. Cos., Inc.* (1998), 131 Ohio App.3d 544, 723 N.E.2d 128.

{¶ 8} As for the promissory estoppel claim, defendants state that Ohio law provides that a claim for promissory estoppel may not be maintained where the terms plaintiff seeks to enforce are inconsistent with those contained in the parties' integrated written agreement. With regard to the fair procedure claim, defendants argue that there is no extracontractual, common-law, public-policy right to due process prior to termination, delistment, or failure to renew a provider agreement. They cite *Sammarco* and *Khoury v. Trumbull Physician Hosp. Org.* (Dec. 8, 2000), 11th App. No. 99–T–0138, 2000 WL 1804356, and note that this claim has been rejected in these similar if not identical cases.

{¶ 9} In reference to the tortuous-interference claim against Dr. Nash, defendants urge that it is a well-established principle that a claim for tortious interference will not lie where plaintiff merely alleges that an agent interfered in plaintiff's relationship with that agent's principal, citing *Anderson v. Minter* (1972), 32 Ohio St.2d 207, 213, 61 O.O.2d 447, 291 N.E.2d 457. As noted by defendants, plaintiff's complaint specifically describes Dr. Nash as Anthem's agent. Due to defendants' resolution of each of the above claims, they necessarily argue that an injunction should not be granted.

{¶ 10} Dr. Pannozzo filed a motion in opposition on May 6, 2002. As aforementioned, he concurred with defendants' factual statements. Thereafter, the memorandum simply argued that the court should adopt the California Supreme Court's decision in *Potvin v. Metro. Life Ins. Co.* (2000), 22 Cal.4th 1060, 95 Cal.Rptr.2d 496, 997 P.2d 1153. The memorandum directed the court to read the rationale set forth in the attached *Potvin* decision and noted that there was a good-faith argument for a change in Ohio law.

{¶ 11} Defendants filed a reply that emphasized how Dr. Pannozzo basically concedes that their motion is well taken because it merely urges a change in Ohio law. Defendants then alternatively explain why *Potvin* should not be adopted in Ohio. Finally, defendants posit that even if *Potvin* were adopted, it would not save plaintiff's claim herein because *Potvin* requires the plaintiff to plead that the insurer possesses power so substantial that the removal from its preferred provider list significantly impairs the ability of an ordinary physician to practice in a particular geographic area.

{¶ 12} On May 30, 2002, the trial court sustained defendants' motion to dismiss the complaint, stating, "Plaintiff's reliance on *Potvin v. Met. Life* is understandable and, perhaps, its result desirable; however, Ohio law governs these issues and dictates the dismissal of this action." Timely notice of appeal was filed.

## ASSIGNMENT OF ERROR NUMBER ONE

{¶ 13} Appellant's sole assignment of error asks in a most lengthy fashion:

{¶ 14} "Whether the appellant had a right to due process based upon common law principles to due process when being termatef [sic] of [sic] off the list published by the appellee and sent to its health insurer's [sic], all done without a hearing or opportunity to be heard, causing substantial economic harm to the appellant who came to rely on said pattern of renewal of the contract with the appellee, and whether Ohio should adopt the ruling in the *Potvin* case, issued by the California Supreme Court, with regard to the rights of the appellant to earn an income so as to give individuals the right to choose their own medical provider, without being penalized by high co-pays."

{¶ 15} Under this assignment, appellant cites two cases, *Potvin v. Metro. Life Ins. Co.* (2000), 22 Cal.4th 1060, 95 Cal.Rptr.2d 496, 997 P.2d 1153, and *Ahmed v. Univ. Hosp. Health Care Sys., Inc.* (Apr. 18, 2002), 8th Dist. No. 79016, 2002 WL 664026, and sets forth different, alternate arguments as to why each should be applied herein. We shall begin by analyzing appellant's arguments relating to the *Ahmed* case.

{¶ 16} First, we note that appellant quotes portions of *Ahmed* out of context in an attempt to fit that decision to the facts of this case. For instance, *Ahmed* mentioned fair procedure and due process. However, that physician was specifically entitled to certain procedural safeguards under written staff bylaws. Other quotes appellant utilizes derive from hospital immunity statutes at issue in *Ahmed* that are inapplicable in the case before us. Appellant also points us to *Ahmed*'s statement that there are a number of factors to consider when a court is deciding whether a breach of contract is material. Appellant then lists all of these factors, argues that they weigh in his favor, and complains that the trial court did not consider them. However, the *Ahmed* case dealt with a breach of bylaws (construed as contractual) and whether that breach was material or immaterial.

{¶ 17} In the present case, the face of the complaint and the attached agreement establish that there was no breach of express contract. Moreover, where the terms of a written contract are clear and unambiguous, courts shall not imply that other terms exist. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 274, 714 N.E.2d 898 (where a matter is specifically covered by the written terms of a contract, there are no implied promises regarding the matter). Thus, if there was no breach of contract, then there was no reason to consider factors to determine the type of breach. Additionally, as appellees point out, appellant basically conceded to the trial court that Ohio law was against him and merely urged the trial court to adopt California law. Appellees also observe that appellant's assignment of error does not contain any mention of the breach-of-contract claim; rather, at most it can be construed as raising errors concerning the decision on the fair-procedure claim and possibly

the promissory-estoppel claim. See App.R. 12(A)(2) (assignment or error may be disregarded if not argued separately); App.R. 16(A)(7) (the argument is to concern the assigned error).

{¶ 18} Appellant also cites *Ahmed* for the proposition that a tortious-interference claim can exist where the evidence shows a motive to interfere with the adverse party's business relation rather than an interference that is a mere consequence of a breach of contract. However, the physician in *Ahmed* alleged that the defendant tortiously interfered with the relationship between himself and his patients. See, also, *Khoury v. Trumbull Physician Hosp. Org.* (Dec. 8, 2000), 11th Dist. No. 99-T-0138, 2000 WL 1804356; *Sammarco v. Anthem Ins. Cos., Inc.* (1998), 131 Ohio App.3d 544, 556–557, 723 N.E.2d 128 (1st Dist.) (where the physicians alleged that the insurer interfered with their relationship with their patients and where the court found that the result was a mere consequence not a purpose).

{¶ 19} Such an interference with the physician-patient relationship is lacking in the matter before us. To the contrary, Dr. Pannozzo alleged that Dr. Nash, who is conceded to be Anthem's agent, tortiously interfered in Dr. Pannozzo's relationship *with Anthem.* As appellees correctly pronounce, a tortious-interference claim does not lie against an agent when the allegedly discontinued relationship concerns only the plaintiff and the agent's principal. *Anderson v. Minter* (1972), 32 Ohio St.2d 207, 213, 61 O.O.2d 447, 291 N.E.2d 457 (tortious-interference claim does not lie against supervisory employee who recommends plaintiff's suspension); *Barilla v. Patella* (2001), 144 Ohio App.3d 524, 533, 760 N.E.2d 898 (8th Dist.) (cannot sue coworker for tortious interference with business relationship with employer); *Daup v. Tower Cellular, Inc.* (2000), 136 Ohio App.3d 555, 567, 737 N.E.2d 128 (cannot sue president/supervisor for interference with relationship with company); *Bodnovich v. ABF Freight Sys., Inc.* (Dec. 12, 1994), 7th Dist. No. 93B36, 1994 WL 705004 (cannot sue agents or employees for alleged interference with relationship with principal or employer). Regardless, in order for Dr. Pannozzo's claim of tortious interference to survive, there must first be a breach of the contract between himself and Anthem. See *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863. Yet, as discussed above, dismissal of the breach-of-contract claim was proper. For these reasons, appellant's various interpretations of *Ahmed* are misguided.

{¶ 20} The essence of appellant's remaining argument may be stated simply. That is, he asks that this court adopt the holding in *Potvin v. Metro. Life Ins. Co.* (2000), 22 Cal.4th 1060, 95 Cal.Rptr.2d 496, 997 P.2d 1153. Appellant specifically recommends that we act as "a superlegislative body" and adopt the policy position of California. In *Potvin,* a health insurer removed a physician from its

preferred provider list under a termination-without-cause clause of the provider agreement. The physician then sued the health insurer for breach of contract and violation of the common-law right to fair procedure. The California Supreme Court reviewed California's case history concerning a common-law right to fair procedure in decisions by private organizations that affect a public interest or can be considered quasi-public. Id. at 500–503, 997 P.2d 1153. In a 4–3 decision, the court found that there does exist a common-law right to fair procedure in some circumstances.

{¶ 21} To support its possible application, the *Potvin* court mentioned a unique tripartite relationship between the insurer, the insureds, and the physicians who participate in the preferred provider network. Id. at 504, 997 P.2d 1153. Nonetheless, the court held that this relationship does not necessarily mean that every insurer desiring to remove a doctor from a preferred provider list must comply with the common-law right to fair procedure. Id. The fair-procedure entitlement, which could void a termination-without-cause clause, does not arise unless the insurer "possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area * * *." Id. The court thus reversed a grant of summary judgment and remanded for further proceedings to determine whether the fair-procedure entitlement applied. Id. at 500, 997 P.2d 1153.

{¶ 22} The dissenters accused the majority of granting physicians special protections and guaranteeing them a minimum income. Id. at 506, 997 P.2d 1153 ( Brown, J., dissenting). The dissent then explained that the cases relied upon by the majority did not utilize a common-law right to fair procedure but dealt with a right to service or a right to work. Id. at 507, 997 P.2d 1153. Finally, the dissent opined that even if removal from a preferred provider list was subject to some common-law right to fair procedure, the physician waived that right by agreeing the insurer could terminate the agreement without cause. Id. at 511, 997 P.2d 1153.

{¶ 23} As mentioned multiple times, Dr. Pannozzo's response to the dismissal motion essentially admitted that Ohio law was against him and merely asked the court to adopt California law. Moreover, as appellees argue, Dr. Pannozzo's complaint does not plead the facts required by *Potvin*, i.e., that the insurer's power was so great that the physician will be deprived of the ability to work in town. Rather, he merely alleges that he is being deprived of revenue from Anthem insureds, although he conceded below that he can still treat these insureds. Nonetheless, we shall review the relevant Ohio law on the subject.

{¶ 24} Appellees cite *Sammarco v. Anthem Ins. Cos., Inc.* (1998), 131 Ohio App.3d 544, 723 N.E.2d 128 (1st Dist.) In that case, physicians sued Anthem

claiming that they had been terminated without cause when they were removed from Anthem's provider lists. The physicians outlined causes of action for unjust enrichment, tortious interference with contract, breach of implied covenant of good faith and fair dealing, wrongful discharge in violation of public policy, negligent misrepresentation, and fraud. As for the public policy argument, the physicians argued that they were terminated for no reason other than the insurer's profit motive.

{¶ 25} The court found that a mere termination without cause does not allege a violation of any duty of good faith and fair dealing. Id. at 555–556, 723 N.E.2d 128. The court noted that wrongful discharge applies to the employment context, and these physicians are not employees of the insurer. Id. at 550–551, 723 N.E.2d 128. The court then noted how physician-noncompete clauses have been invalidated if they affect the public's ability to obtain medical care. However, the court proceeded to explain, "[t]he at-will termination clause in the contract, unlike a noncompete clause, in no way prohibits a physician from treating certain patients and places no affirmative restrictions on the physician's ability to practice where and in the manner he wants." Id. at 551, 723 N.E.2d 128. The court thus found that any public policies discouraging restrictions on a physician's ability to practice were not implicated. Id.

{¶ 26} The *Sammarco* court then distinguished the case of *Harper v. Healthsource New Hampshire* (1996), 140 N.H. 770, 674 A.2d 962, a case that was relied upon by the *Potvin* court and distinguished by the *Potvin* dissent. The *Sammarco* court concluded that the physicians identified no public policy or statutory provision that would prevent a termination without cause. Id. at 553–554, 723 N.E.2d 128. The court then notes that the Ohio legislature has since enacted R.C. 1753.09, effective October 1998, which governs termination of provider agreements. However, even under that statute, the *Sammarco* court found that the physicians' claims would fail. The court concluded that the physicians' complaint was properly dismissed.

{¶ 27} R.C. 1753.09(A) requires certain procedural safeguards where a health insuring corporation seeks to terminate a provider's participation on the basis of the provider's failure to meet the standard for quality or utilization in the delivery of health care services. However, R.C. 1753.09(F)(1) provides that nothing in the statute prohibits an insurer from terminating a provider's contract if the insurer determines that the health care needs of its enrollees are being met and no need exists for the provider's services. Where the complaint fails to allege the presence of R.C. 1753.09(A) facts or the absence of R.C. 1753.09(F)(1) facts or cite the statute, it does not allege a cause of action under the statute. *Sammarco*, 131 Ohio App.3d at 554, 723 N.E.2d 128. Here, appellant does not allege the presence or absence of any relevant facts in the complaint or cite the

statute. Moreover, even after *appellees* raised the existence of the statute, appellant did not set forth any argument on the statute's application.[1] Additionally, both parties opined at oral argument that the statute was inapplicable, with appellant merely pointing to it as an example of the procedure that we could create in cases of termination without cause. For all of these reasons, we need not delve further into whether division (F)(1) would provide a cause of action if read in the negative.

{¶ 28}  We now move to the second Ohio case cited by appellees in support of the trial court's decision, *Khoury v. Trumbull Physician Hosp. Org.* (Dec. 8, 2000), 11th Dist. No. 99–T–0138, 2000 WL 1804356. In that case, the insurer terminated a physician from its list of providers. The physician sued for unjust enrichment, tortious interference with a contractual relationship, breach of implied covenant of good faith and fair dealing, and various due process of law claims. The *Khoury* court disagreed with the New Hampshire court's holding in *Harper* (cited by *Potvin*) and instead followed what it considered to be the law existing in Ohio. Id. at 7. The *Khoury* court cited R.C. 1753.09(F)(1) and stated that, although it was not applicable to the case before it due to the effective date, the statute provides good guidance on Ohio's public policy in a manner unfavorable to the physician's case. Id. at 7–8. See, also, Krause, The Brief Life of The Gag Clause; Why Anti–Gag Legislation Isn't Enough (Fall 1999), 67 Tenn. L.Rev. 1, 32–34, fn. 157, citing R.C. 1753.09(F)(1) as an example of how state legislatures have not protected physicians from terminations without cause. The court concluded by upholding the grant of summary judgment in favor of the insurer.

{¶ 29}  Appellees then cite two Colorado cases providing that terminationwithout-cause clauses should be respected and that a physician cannot rely on an implied duty of good faith and fair dealing to circumvent bargained-for terms. Appellees also cite a federal Court of Claims case that rejects the rationale of *Potvin.* Finally, appellees cite a Florida appellate case which expressly adopted Ohio's First Appellate District's decision in *Sammarco. Mendez v. Blue Cross & Blue Shield of Florida* (Fla.), 12th Cir. No. 2001–CA–2628.

---

1. The contract seemingly conceded to be the one at issue covered 1998, 1999, and 2000 terminated *automatically* at the end of the three-year term. Cf. N.Y. Pub. Health Law 4406–d 3. (distinguishing between termination and nonrenewal) versus 24–A Maine Revised Statutes 4303 3–A (revealing that a termination without cause clause cannot supersede the procedural requirements of the Maine statute and that termination includes nonrenewal). The one-year contract for 2001, which was attached to plaintiff's complaint, automatically renewed itself unless a party decided not to renew the contract, in which case the party was to follow the procedure for termination. This contract contains integration language that it supersedes all prior contracts or understandings.

{¶ 30} In accordance with the above recitation of law, we agree that Ohio law supports dismissal of plaintiff's complaint. In reviewing R.C. 1753.09, it is clear that the legislature of this state could have created public policy to assist a physician in the same situation as Dr. Pannozzo if it were so inclined. However, this court will not create such a procedure in the absence of legislative action.

{¶ 31} We are cognizant of the doctrine of separation of powers and thus refuse appellant's invitation to act as a "superlegislative" body. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 456, 715 N.E.2d 1062 (reminding that the policy or wisdom of a statute is the exclusive concern of the legislative branch of government). Public policy is to be determined by the legislature, not the court. Id. See, also, *Goodman v. Goodman* (2001), 144 Ohio App.3d 367, 373, 760 N.E.2d 72 (advising that the plaintiff's remedy is to seek a legislative change of the statute as opposed to judicial imposition of public policy that invades the separation of powers doctrine); *Moore v. Dague* (1975), 46 Ohio App.2d 75, 85, 75 O.O.2d 68, 345 N.E.2d 449 (noting that the courts shall not substitute their judgment for that of legislature as to what laws should be enacted). As such, we will not overstep our constitutionally defined authority and thus decline to adopt the public policy of California set forth in *Potvin.*

{¶ 32} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Judgment affirmed.

WAITE, P.J., and DEGENARO, J., concur.