95 Cal.Rptr.2d 496 (2000)
22 Cal.4th 1060
997 P.2d 1153
Louis E. POTVIN, Plaintiff and Appellant,
v.
METROPOLITAN LIFE INSURANCE COMPANY, Defendant and Respondent.
No. S061945.
Supreme Court of California.
May 8, 2000.
Rehearing Denied June 28, 2000.[*]
*498 Law Offices of Henry R. Fen ton, Henry R. Fenton and Dennis E. Lee, Los Angeles, for Plaintiff and Appellant.
Catherine I. Hanson, San Francisco, for the California Medical Association, the American Medical Association and the American College of Obstetricians and Gynecologists as Amici Curiae on behalf of Plaintiff and Appellant.
Astrid G. Meghrigian, San Francisco, for the California Medical Association, the American Medical Association, the Immune Deficiency Foundation, Breast Cancer Action and the Temporomandibular Joint Dysfunction Society as Amicus Curiae on behalf of Plaintiff and Appellant.
Ann Allen for the American College of Obstetricians and Gynecologists as Amici Curiae on behalf of Plaintiff and Appellant.
Joseph R. Grodin, Berkeley; Friedman, Ross & Hersh, Pillsbury, Madison & Sutro, Jeffrey S. Ross, Michael J. Kass and Paul E. Jahn, San Francisco, for the American Medical Association and the California Medical Association as Amici Curiae on behalf of Plaintiff and Appellant.
Stephan, Oringher, Richman & Theodora, Harry W.R. Chamberlain II, Los Angeles, Ellen Kamon; Rosato & Samuels, Cary S. Samuels, Los Angeles, and Ann C. Schneider for Defendant and Respondent.
Foley Lardner Weissburg & Aronson, Foley & Lardner, J. Mark Waxman, Lowell C. Brown, Robyn A. Meinhardt, Hema R. Anwar, Los Angeles; Epstein Becker & Green and William A. Helvestine, San Francisco, for California Association of Health Plans and Association of California Life and Health Insurance Companies as Amici Curiae on behalf of Defendant and Respondent.
Carroll, Burdick & McDonough, Foley & Lardner, Paul A. Stewart, David M. Rice and Mark E. Reagan for Hill Physicians Medical Group, Inc., as Amicus Curiae on behalf of Defendant and Respondent.
Davis Wright Tremaine, Peter N. Grant, Harry Shulman and W. Reece Hirsch for American Medical Group Association, the IPA Association of America and the National IPA Coalition as Amici Curiae on behalf of Defendant and Respondent.
Davis Wright Tremaine and W. Clark Stanton for California Healthcare Association as Amicus Curiae on behalf of Defendant and Respondent.
*497 KENNARD, J.
After removal from defendant insurance company's "preferred provider" lists, plaintiff physician brought this action. Citing the common law right to fair procedure, which forbids arbitrary expulsions from private organizations under certain circumstances, plaintiff alleged he should *499 have been given reasonable notice and an opportunity to be heard before his removal.
We first applied the common law doctrine of fair procedure in the late 19th century in two cases involving membership expulsions that adversely affected rights in specified funds held by the organization. Some 50 years later, relying on the general principles underlying this doctrine, we held in James v. Marinship Corp. (1944) 25 Cal.2d 721, 155 P.2d 329 (Marinship) that a union could not arbitrarily deny full membership privileges to African-American workers. Thereafter, in the 1960's and 1970's, we extended the doctrine in a trio of decisions, Pinsker v. Pacific Coast Soc. of Orthodontists (1969) 1 Cal.3d 160, 81 Cal.Rptr. 623, 460 P.2d 495 (Pinsker I), Pinsker v. Pacific Coast Society of Orthodontists (1974) 12 Cal.3d 541, 116 Cal.Rptr. 245, 526 P.2d 253 (Pinsker II), and Ezekial v. Winkley (1977) 20 Cal.3d 267, 142 Cal.Rptr. 418, 572 P.2d 32 (Ezekial). The two Pinsker cases involved the exclusion of a dentist from professional organizations, while Ezekial pertained to a hospital's expulsion of a surgical resident.
The general principles this court enunciated in the Marinship-Pinsker-Ezekial decisions apply in this case as well.

I
On September 10, 1990, Metropolitan Life Insurance Company (MetLife) entered into an agreement with Dr. Louis E. Potvin, an obstetrician and gynecologist, to include him as one of 16,000 participants on two of its preferred provider lists. Potvin had practiced medicine for more than 35 years; he was a past president of the Orange County Medical Association; and he held full staff privileges at Mission Regional Hospital, where he had served as Chairman of the Obstetrics and Gynecology Department for nine years. Under the contract, Potvin was to provide medical services to MetLife's insureds in return for agreed-upon payment by MetLife. The agreement created no employment or agency relationship, and it allowed Potvin to also "contract with other preferred provider organizations, health maintenance organizations or other participating provider arrangements." It provided for termination by either party "at any time, with or without cause, by giving thirty (30) days prior written notice to the other party."
On July 22, 1992, MetLife notified Potvin in writing that effective August 31, 1992, it was terminating his preferred provider status. Potvin asked for clarification; MetLife replied that the termination, which the parties here also refer to as "delistment," was consistent with the contract, which allowed termination "without cause." When Potvin insisted on a further explanation, MetLife reiterated its right to terminate without cause. MetLife then stated that even though it did not have to give a reason, Potvin's "delistment from the provider network was related to the fact that [he] did not meet [MetLife's] current selection and retention standard for malpractice history." At the time, MetLife would not include or retain on its preferred provider lists any physician who had more than two malpractice lawsuits, or who had paid an aggregate sum of $50,000 in judgment or settlement of such actions. Potvin's patients had sued him for malpractice on four separate occasions, all predating his 1990 agreement with Met-Life. In three of these actions, the plaintiffs had abandoned their claims, while the fourth case had settled for $713,000.
After MetLife failed to respond to Potvin's request for a hearing, Potvin filed this lawsuit. His complaint set forth two causes of action, one entitled "Violation of Business and Professions Code section 805 et seq. and for Violation of Fair Procedure," the other claiming breach of the preferred provider contract. Potvin alleged that MetLife's termination of his preferred provider status devastated his practice, reducing it to "a small fraction" of his former patients. He asserted that he was required to reveal his termination *500 to other insurers and managed care entities, which then removed him from their preferred provider lists, and that he suffered rejection by "physician groups ... dependent upon credentialling by MetLife" and by current MetLife preferred provider physicians, who ceased referring patients to him.
The trial court granted MetLife's motion for summary judgment. It agreed with MetLife that Potvin's complaint did not allege a claim for violation of the common law right to fair procedure, and it refused Potvin's request to amend his complaint to add such a claim. On the breach of contract claim, the trial court ruled that Met-Life had validly exercised its right under the preferred provider agreement to terminate its relationship with Potvin with or without cause with 30 days' written notice. With regard to the asserted violation of Business and Professions Code section 805 et seq., the trial court concluded that those provisions, which govern peer review of a licensed health care facility's decision to terminate a physician's medical privileges, were inapplicable to the preferred provider agreement between MetLife and Potvin.
The Court of Appeal reversed. It disagreed with the trial court that Potvin's complaint failed to allege a claim for violation of the common law right to fair procedure. It also held that, before removing Potvin from its preferred provider lists, MetLife should have given him notice of the grounds for its action and a reasonable opportunity to be heard. With respect to Potvin's assertion that the removal violated Business and Professions Code section 805 et seq. setting forth procedures for physician peer review, the Court of Appeal agreed with the trial court that those provisions did not apply to the preferred provider contract involved here.
We granted MetLife's petition for review.[1] We affirm the Court of Appeal's reversal of the trial court's grant of summary judgment for MetLife, but we disagree with the Court of Appeal that MetLife necessarily must comply with the common law doctrine of fair procedure before removing physicians from its preferred provider lists. In this case, that issue needs to be resolved by further proceedings in the trial court under the standards set forth below.

II
The purpose of the common law right to fair procedure is to protect, in certain situations, against arbitrary decisions by private organizations. As this court has held, this means that, when the right to fair procedure applies, the decisionmaking "must be both substantively rational and procedurally fair." (Pinsker II, supra, 12 Cal.3d at p. 550, 116 Cal. Rptr. 245, 526 P.2d 253.)
This court first applied the common law right to fair procedure in two late 19th-century decisions, Otto v. Tailors' P. & B. Union (1888) 75 Cal. 308, 17 P. 217 (Otto) and Von Arx v. San Francisco G. Verein (1896) 113 Cal. 377, 45 P. 685 (Von Arx), *501 both of which involved an association's membership expulsions that adversely affected rights in specified funds held for the association's members. We held in Otto that an unincorporated trade union's expulsion of a member for an offense subject only to a fine was "not in good faith, was not fair, and was contrary to natural justice." (Otto, supra, at p. 315, 17 P. 217.) And in Von Arx we said that a social and mutual aid society of Swiss immigrants could expel a member only if it gave "reasonable notice of the proceeding ... and a fair opportunity of presenting [a] defense in accordance with general principles of law and justice." (Von Arx, supra, at pp. 379-380, 45 P. 685.) In each case, we justified court intervention as necessary to protect the affected member's property rights in the funds in question against arbitrary deprivation by the association. (Otto, supra, at p. 311, 17 P. 217 [Otto was "a regular member ... of the benevolent fund branch of the association, and entitled to its pecuniary benefits"]; Von Arx, supra, at p. 379, 45 P. 685 [Von Arx had contributed $1,000 of the $15,000 held by the association for the benefit of its members].)
Almost 50 years later, we drew on those principles to prevent a labor union and an employer from discriminating against African-American workers on the arbitrary basis of their race. In Marinship, supra, 25 Cal.2d 721, 155 P.2d 329, a unanimous decision authored by Chief Justice Phil S. Gibson, we upheld an injunction restraining the labor union and the employer, a Marin County shipbuilder, from "discharging or causing the discharge of ... Negro employees because they are not members of a labor union with which their employer has a closed shop agreement, but which will not grant Negroes full membership privileges." (Id. at pp. 724-725, 155 P.2d 329.) We rejected the union's contention that it "may, for any arbitrary reason whatsoever, entirely close its membership to otherwise qualified persons and at the same time may, by enforcing a closed shop contract, demand union membership as a condition to the right to work." (Id. at p. 730,155 P.2d 329.)
We explained: "It was well established at common law that innkeepers and common carriers were under a duty to furnish accommodations to all persons, in absence of some reasonable ground.... The analogy of the public service cases ... refutes defendants' contention that a statute is necessary to enforce such a policy where private rather than public action is involved. [¶] Where, as here, a labor union has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason [of their race]. Use of economic pressure, by a union that does not admit Negroes, to compel the discharge of Negro employees may be enjoined." (Marinship, supra, 25 Cal.2d at p. 740, 155 P.2d 329.)
Thereafter, in the 1960's and 1970's, we applied these fair procedure principles in a trio of cases involving licensed dental and medical professionals. The first of these cases was Pinsker I, supra, 1 Cal.3d 160, 81 Cal.Rptr. 623, 460 P.2d 495. There, we held that a dentist specializing in orthodontics and rejected for membership in local, regional, and national associations of orthodontists had "a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, including the showing of cause for rejection." (Id. at p. 166, 81 Cal.Rptr. 623, 460 P.2d 495.) We noted that under California's Dental Practice Act a dentist seeking to specialize in orthodontics needed no separate license; but if a dentist wished to obtain private certification as a "Diplomate" in orthodontics, membership in the defendant associations was, "if not absolutely essential, at least extremely helpful." (Id. at p. 163, 81 Cal. Rptr. 623, 460 P.2d 495.)
We said: "Because of the unique position in the field of orthodontics occupied by defendant [associations], membership *502 therein, although not economically necessary in the strict sense of the word ..., would appear to be a practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty. Defendant associations hold themselves out to the public and the dental profession generally as the sole organizations recognized by the [American Dental Association], which is itself a virtual monopoly, to determine standards, both ethical and educational, for the practice and certification of orthodontics. Thus, a public interest is shown, and the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications." (Pinsker I, supra, 1 Cal.3d at p. 166, 81 Cal.Rptr. 623, 460 P.2d 495.) To support our conclusion that the defendant associations had a "fiduciary responsibility" (ibid.), we relied on a then-recent law review article, The Individual and the Public Service Enterprise in the New Industrial State (1967) 55 Cal. L.Rev. 1247, authored by Mathew O. Tobriner (at that time a justice of this court) and Joseph R. Grodin (then a practicing lawyer but later a justice of this court).
We remanded the matter to allow the defendant associations of orthodontists an opportunity to show that their exclusion of the plaintiff was not arbitrary or capricious. (Pinsker I, supra, 1 Cal.3d at pp. 166-167, 81 Cal.Rptr. 623, 460 P.2d 495.) On remand, the defendant associations gave this reason for not accepting the plaintiff as a member: Although the plaintiff had completed the postgraduate course work required for membership, his partner in the dental practice had not. After learning from a member that the plaintiff and his partner "shared" patients, the defendant organizations expressed concern that this sharing might violate a principle of ethics governing their members that an orthodontist "`not delegat[e] to a person less qualified any service or operation which requires the professional competence of an orthodontist,'" and on this basis they rejected the plaintiffs membership application without giving him an opportunity to be heard. (Pinsker II, supra, 12 Cal.3d at p. 546, 116 Cal.Rptr. 245, 526 P.2d 253.) The trial court ruled that the defendants' membership rejection was not arbitrary. (Id. at p. 549, 116 Cal.Rptr. 245, 526 P.2d 253.) The court also found that by conducting some investigation into the matter, the defendants had satisfied the requirements of procedural fairness. (Ibid.)
We disagreed. We rejected the defendants' claim that under Pinsker I, supra, 1 Cal.3d 160, 81 Cal.Rptr. 623, 460 P.2d 495, they need only show that as a substantive matter the rejection of the plaintiffs membership application was rational. (Pinsker II, supra, 12 Cal.3d at p. 550, 116 Cal. Rptr. 245, 526 P.2d 253.) That argument, we pointed out, ignored the common law precedents on which Pinsker I rested: "Taken together, these decisions establish the common law principle that whenever a private association is legally required to refrain from arbitrary action, the association's action must be both substantively rational and procedurally fair." (Pinsker II, supra, at p. 550, 116 Cal.Rptr. 245, 526 P.2d 253.) We remanded the case to give Pinsker "a fair opportunity to answer the charges against him." (Id, at p. 561, 116 Cal.Rptr. 245, 526 P.2d 253.)
Three years later we decided Ezekial, supra, 20 Cal.3d 267, 142 Cal.Rptr. 418, 572 P.2d 32. In that case, Kaiser Foundation Hospital had invited the plaintiff physician, a San Diego general practitioner, to join Kaiser's surgical residency program in Los Angeles. To accept the offer, the plaintiff had to close his medical practice and move his family. He entered Kaiser's four-year surgical residency program in Los Angeles, but after one and one-half years Kaiser terminated him without notice and a hearing. This court concluded that the plaintiffs allegation that the dismissal would "effectively prevent his entry into the medical specialty for which his *503 [surgical] residency training was preparing him" was sufficient to entitle him to "rudimentary procedural and substantive fairness." (Id, at p. 278, 142 Cal.Rptr. 418, 572 P.2d 32.)
We explained: "The underlying rationale of the Marinship-Pinsker line of cases is that certain private entities possess substantial power either to thwart an individual's pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced." (Ezekial, supra, 20 Cal.3d at p. 272, 142 Cal.Rptr. 418, 572 P.2d 32, citing Tobriner & Grodin, The Individual and the Public Service Enterprise in the New Industrial State, supra, 55 Cal.L.Rev. at p. 1255.) "The Marinship-Pinsker principles," we said, primarily precluded "arbitrary exclusions from membership in private associations," and were "narrowly applied to situations with substantial economic ramifications." (Ezekial, supra, at p. 272, 142 Cal.Rptr. 418, 572 P.2d 32.) We went on to say: "Prior to Marinship, however, it was established that one may not be expelled from membership in a private association without charges, notice and hearing. This common law protection against arbitrary expulsion, judicially declared, is of broader application and has been extended not only to labor unions [citations] and professional and trade organizations [citations], but to mutual benefit societies [citations] and other fraternal and social groups [citation]. The underlying theme of these decisions, variously stated, is that membership in an association, with its associated privileges, once attained, is a valuable interest which cannot be arbitrarily withdrawn. Thus, they comport with the broader principle that one on whom an important benefit or privilege has already been conferred may enjoy legal protections not available to an initial applicant for the same benefit." (Id, at pp. 272-273, 142 Cal.Rptr. 418, 572 P.2d 32, original italics.)
We further reasoned in Ezekial: "In California, a licensed physician or dentist is legally and fully qualified to practice in the field encompassed within his license; the state imposes no additional legal requirements for practice of a medical or dental specialty. To ensure higher standards of competence and ethics, however, these professions have adopted extensive systems of post-license private regulation. Through professional society memberships, specialty certification requirements, and hospital admission policies, the professions can effectively control the individual licensee's practical ability to utilize the license conferred." (Ezekial, supra, 20 Cal.3d at p. 273, 142 Cal.Rptr. 418, 572 P.2d 32.)

III
The private organizations in our Marinship-Pinsker-Ezekial cases (respectively, a labor union; local, regional, and national associations of orthodontists; and a hospital offering a surgical residency program) all shared an attribute of significance in our determination that they were subject to the common law right to fair procedure. Each one was a private entity affecting the public interest. As has been recognized: "[C]ertain institutions and enterprises are viewed by the courts as quasi-public in nature: The important products or services which these enterprises provide, their express or implied representations to the public concerning their products or services, their superior bargaining power, legislative recognition of their public aspect, or a combination of these factors, lead courts to impose on these enterprises obligations to the public and the individuals with whom they deal, reflecting the role which they have assumed, apart from and in some cases despite the existence of a contract." (Tobriner & Grodin, The Individual and the Public Service Enterprise in the New Industrial State, supra, 55 Cal. L.Rev. at p. 1253, fns. omitted.)
Plaintiff here points out that when an insurance company with fiduciary obligations to its insureds maintains a list of preferred provider physicians to render *504 medical services to the insureds, a significant public interest is affected. One practical effect of the health care revolution, which has made quality care more widely available and affordable through health maintenance organizations and other managed care entities, is that patients are less free to choose their own doctors for they must obtain medical services from providers approved by their health plan. The Managed Health Care Improvement Task Force stressed in its 1997 report to the California Legislature that the provision of health care "has a special moral status and therefore a particular public interest." (Cal. Managed Health Care Improvement Task Force, Rep. to Leg. (Dec. 13, 1997) Government Regulation and Oversight of Managed Health Care, Findings and Recommendations, p. 1.) But an even greater public interest is at stake when those medical services are provided through the unique tripartite relationship among an insurance company, its insureds, and the physicians who participate in the preferred provider network. As the New Hampshire Supreme Court noted recently in Harper v. Healthsource New Hampshire, Inc. (1996) 140 N.H. 770, 674 A.2d 962, 966, the removal of a physician from a preferred provider list "affects more than just [the doctor's] own interest," adding that "[t]he public has a substantial interest in the relationship between health maintenance organizations and their preferred provider physicians."
Our conclusion that the relationship between insurers and their preferred provider physicians significantly affects the public interest does not necessarily mean that every insurer wishing to remove a doctor from one of its preferred provider lists must comply with the common law right to fair procedure. The obligation to do so arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest.[2]
In our Marinship-Pinsker-Ezekial cases, the private entities each had substantial power that significantly impaired the affected individuals' ability to work in a particular field or profession. In Marinship, the union exercised "a monopoly of the supply of labor" (Marinship, supra, 25 Cal.2d at p. 731, 155 P.2d 329); in the two Pinsker cases, the orthodontic associations operated "a virtual monopoly" while "determining] standards, both ethical and educational," for the practice of that profession (Pinsker I, supra, 1 Cal.3d at p. 166, 81 Cal.Rptr. 623, 460 P.2d 495; accord, Pinsker II, supra, 12 Cal.3d at p. 544, 116 Cal.Rptr. 245, 526 P.2d 253); and in Ezekial, the hospital's surgical residency program was part of an "extensive system[ ] of post-license private regulation" (Ezekial, supra, 20 Cal.3d at p. 273, 142 Cal. Rptr. 418, 572 P.2d 32).
Here, plaintiffs amici curiae, the American Medical Association and the California Medical Association, assert in their joint brief that "the managed care organizations operating in California hold substantial economic power over physicians and their patients." They also contend that "the control exercised by managed care organizations makes access to provider panels a `practical prerequisite' to any effective practice as a health care provider." Various legal commentators agree. (See Little, Managed Care Contracts of Adhesion: Terminating the Doctor-Patient Relationship and Endangering Patient Health (1997) 49 Rutgers L.Rev. 1397, 1448 ["Many physicians rely on [managed care] participation to maintain their practices"]; *505 Kadzielski et al., Managed Care Contracting: Pitfalls and Promises (1998) 20 Whittier L.Rev. 385, 387, 405 [asserting that managed care plans administer employer-provided health care for 80 percent of employees and that "[i]n California, the solo medical practitioner is near extinction"].) Others predict that in the near future no more than a handful of health care entities will dominate the managed care industry. (See Kadzielski et al., Credentialing in Managed Care: The New Frontier (1997) 19 Whittier L.Rev. 83, 84 [noting a forecast by the California Healthcare Association that "by the year 2005, California will have only three to seven dominant provider networks statewide"].) If participation in managed care arrangements is a practical necessity for physicians generally and if only a handful of health care entities have a virtual monopoly on managed care, removing individual physicians from preferred provider networks controlled by these entities could significantly impair those physicians' practice of medicine.
Here, Potvin alleged that among the adverse effects of removal from MetLife's preferred provider lists were rejection by "physician groups which were dependent upon credentialling by MetLife" and devastation of his practice, which was reduced to "a small fraction" of his former patients. Proof of these allegations might establish that, in terminating a physician's preferred provider status, MetLife wields power so substantial as to significantly impair an ordinary, competent physician's ability to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest.
Loss of income may be relevant in determining whether removal from an insurer's preferred provider list significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest. Any inquiry regarding the extent of such impairment must be an objective one. Thus, any evidence of Potvin's loss of income after his expulsion by MetLife, although relevant, would not be conclusive proof that removal from MetLife's preferred provider lists will generally reduce physician income so significantly as to impair the ability to practice medicine.
Our holding, as described 95 Cal. Rptr.2d on pages 503-505, 997 P.2d on pages 1158-1161, ante, does not prevent an insurer subject to obligations of common law fair procedure from exercising its sound business judgment when establishing standards for removal of physicians from its preferred provider lists. We simply hold that, under principles recognized by the common law of this state for over a century, such removal must be "both substantively rational and procedurally fair." (Pinsker II, supra, 12 Cal.3d at p. 550, 116 Cal.Rptr. 245, 526 P.2d 253.)
From this limited right to fair procedure, the dissent conjures up the illusion that our decision today "declares that it is the public policy of this state that physicians are entitled to a minimum income." (Dis. opn., post, 95 Cal.Rptr.2d at p. 506, 997 P.2d at p. 1162.) Nothing in our decision expressly or impliedly says that. As we have explained, the common law right to fair procedure does not apply to an insurer's removal of a physician from its preferred provider list unless the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest. (See ante, at pp. 503-505, 997 P.2d pp. 1158-1161.) Even when this common law right does apply, an insurer may remove a physician from its preferred provider list without regard to the financial effect on the physician, so long as the insurer's decision is "substantively rational *506 and procedurally fair." (Pinsker II, supra, 12 Cal.3d at p. 550, 116 Cal.Rptr. 245, 526 P.2d 253.)
MetLife contends that even if removal of a physician from its preferred provider lists is subject to the common law right to fair procedure, here Potvin waived that right by agreeing that MetLife could terminate the provider arrangement without cause. Potvin responds that the public policy considerations supporting the common law right to fair procedure render the "without cause" clause in the MetLife preferred provider agreement unenforceable.[3] Faced with similar arguments, the New Hampshire Supreme Court declined to enforce a "without cause" provision in a contract between a health maintenance organization and one of its preferred provider physicians, allowing the case to go to trial on the physician's claim that the summary termination of his provider status violated the contractual obligations of good faith and fair dealing. (Harper v. Healthsource New Hampshire, Inc., supra, 674 A.2d at pp. 964-966.) California courts, too, are loathe to enforce contract provisions offensive to public policy. (Kreamer v. Earl (1891) 91 Cal. 112, 117, 27 P. 735 ["`No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication'"]; accord, Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 381, 33 Cal.Rptr.2d 63, 878 P.2d 1275.) We therefore agree with Potvin that the "without cause" termination clause is unenforceable to the extent it purports to limit an otherwise existing right to fair procedure under the common law.

DISPOSITION
The judgment of the Court of Appeal is affirmed.
GEORGE, C.J., MOSK, J., and WERDEGAR, J., concur.
Dissenting Opinion by BROWN, J.
I dissent. With its decision today, the majority, in effect, declares that it is the public policy of this state that physicians are entitled to a minimum income and, therefore, if removal of a physician from an insurer's preferred provider list would reduce the physician's income below that guaranteed minimum, the physician is entitled to a hearing and to the judicial review that would inevitably follow upon an adverse decision. What is the majority's authority for declaring this public policy, for singling out physicians for such special treatment? Only recently this court reaffirmed its commitment to the principle that, "aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state. [Citations.]" (Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66, 71, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (Green).) Therefore, one would assume, the Legislature must have spoken on this question, and the majority is simply implementing the public policy declared by the Legislature. That assumption would be mistaken, however. The majority relies, instead, on the common law for its asserted authority to declare public policy on this question. This in spite of the fact that "it is generally agreed that `public policy' as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, `lest they mistake their own predilections for public policy which deserves recognition at law.' (Hentzel v. Singer Co. [ (1982) ] 138 Cal.App.3d 290, 297 [188 Cal. Rptr. 159].)" (Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, 1095, 4 Cal.Rptr.2d 874, 824 P.2d 680.)
*507 In consulting its own predilections, the majority once again invokes the expansive and expansible doctrine this court has constructed upon the common law right of fair procedure. This court traces the modern origins of its common law right of fair procedure to our opinion in James v. Marinship Corp. (1944) 25 Cal.2d 721, 155 P.2d 329 (Marinship). (Ezekial v. Winkley (1977) 20 Cal.3d 267, 271, 142 Cal.Rptr. 418, 572 P.2d 32 (Ezekial); Pinsker v. Pacific Coast Society of Orthodontists (1974) 12 Cal.3d 541, 551, 116 Cal.Rptr. 245, 526 P.2d 253.) We must, therefore, closely examine Marinship before going on to discuss the other errors in the majority's analysis.

The Majority's Reliance on Marinship Is Misplaced
The majority's reliance on Marinship is misplaced for three reasons:
(1) Marinship did not involve the common law right of fair procedure. That right has been defined by this court as including adequate notice of the charges and a reasonable opportunity to respond. (Ezekial, supra, 20 Cal.3d at p. 272, 142 Cal.Rptr. 418, 572 P.2d 32.) In Marinship, a union with a closed shop agreement discriminated against applicants on the basis of race. This court did not say that such discrimination was unobjectionable so long as the union gave applicants notice and an opportunity to respond to the "charge" of belonging to a racial minority. Rather, we held that "an arbitrarily closed or partially closed union is incompatible with a closed shop" (Marinship, supra, 25 Cal.2d at p. 731, 155 P.2d 329), with the result that "Negroes must be admitted to membership under the same terms and conditions applicable to non-Negroes unless the union and the employer refrain from enforcing the closed shop agreement against them." (Id. at p. 745, 155 P.2d 329.)
The common law right extended in Marinship, therefore, was not the right to fair procedure, but the right to service. "It was well established at common law that innkeepers and common carriers were under a duty to furnish accommodations to all persons, in absence of some reasonable ground [citations], and if colored persons are furnished separate accommodations they must be equally safe, commodious and comfortable. [Citations.] The analogy of the public service cases not only demonstrates a public policy against racial discrimination but also refutes defendants' contention that a statute is necessary to enforce such a policy where private rather than public action is involved." (Marinship, supra, 25 Cal.2d at p. 740, 155 P.2d 329.)
(2) The fact that the union in Marinship exercised monopoly power was important to our decision in that case. "Where a union has, as in this case, attained a monopoly of the supply of labor by means of closed shop agreements and other forms of collective labor action, such a union occupies a quasi public position similar to that of a public service business and it has certain corresponding obligations.... Its asserted right to choose its own members does not merely relate to social relations; it affects the fundamental right to work for a living. [Citations.]" (Marinship, supra, 25 Cal.2d at p. 731, 155 P.2d 329.)
Historically, the common law duty to serve arose in response to the fact that in the 15th century those engaged in certain public callings, for example, innkeepers and carriers, exercised virtual monopolies. "When the weary traveller reaches the wayside inn in the gathering dusk, if the host turn him away what shall he do? Go on to the next inn? It is miles away, and the roads are infested with robbers. The traveller would be at the mercy of the innkeeper, who might practice upon him any extortion, for the guest would submit to anything almost, rather than be put out into the night." (Wyman, The Law of the Public Callings as a Solution to the Trust Problem (1904) 17 Harv. L.Rev. 156, 159.) And the existence of monopoly power is a requisite of not only the common law right *508 to service, but also of the common law right of fair procedure. "Forgoing repetitious analysis of cited cases [finding a common law right of fair procedure], I can safely assert that in every authority relied upon by the majority there was an element of monopoly control of the professional practice involved." (Ezekial, supra, 20 Cal.3d 267, 281, 142 Cal.Rptr. 418, 572 P.2d 32 (dis. opn. of Mosk, J.).)
Certainly in Pinsker v. Pacific Coast Soc. of Orthodontists (1969) 1 Cal.3d 160, 81 Cal.Rptr. 623, 460 P.2d 495 (Pinsker I), this court's decision was bottomed on the monopoly control the American Association of Orthodontists (AAO) exercised over the field of orthodontics. "Because of the unique position in the field of orthodontics occupied by defendant AAO and its constituent organizations, membership therein, although not economically necessary in the strict sense of the word ..., would appear to be a practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty. Defendant associations hold themselves out to the public and the dental profession generally as the sole organizations recognized by the ADA, which is itself a virtual monopoly, to determine standards, both ethical and educational, for the practice and certification of orthodontics. Thus, a public interest is shown, and the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications." (Id. at p. 166, 81 Cal.Rptr. 623, 460 P.2d 495.)
Although the majority in Ezekial stated that "the application of the common law rule [of fair procedure] does not depend on the existence of `monopoly' power" (Ezekial, supra, 20 Cal.3d at p. 277, 142 Cal. Rptr. 418, 572 P.2d 32), what this court actually found was that Kaiser Foundation Hospital's termination of the plaintiff from its surgical residency program meant that he would never be able to practice as a surgeon at any other accredited hospital in California. "Dismissal from Kaiser will, as a practical matter and because of Kaiser's close relationship with other teaching hospitals, prevent plaintiffs acceptance in any other surgical residency program. Successful completion of an approved surgical residency is a prerequisite to attainment of the status of a `board certified general surgeon,' without which plaintiff cannot practice a surgical specialty in any accredited California hospital." (Id. at pp. 270-271, 142 Cal.Rptr. 418, 572 P.2d 32.) From the plaintiffs point of view, that was certainly tantamount to the exercise of monopoly power.
If, in Ezekial, the doctrine this court had constructed on the common law right of fair procedure began to slip from its moorings in monopoly power, it is now entirely adrift. Under the standard announced by the majority today, an insurer need not exercise monopoly power before the burdens of the common law right of fair procedure are imposed on it. Rather, as I explain below, it is sufficient if the insurer has any significant share of a regional market.
(3) Marinship, unlike the majority's decision in this case, is consistent with our long-held principle that, "aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state." (Green, supra, 19 Cal.4th at p. 71, 78 Cal.Rptr.2d 16, 960 P.2d 1046.) Marinship can be squared with this principle because the ultimate source of the public policy announced there was the federal Constitution. "The discriminatory practices involved in this case are, moreover, contrary to the public policy of the United States and this state. The United States Constitution has long prohibited governmental action discriminating against persons because of race or color. (5th, 14th, and 15th Amendments.)" (Marinship, supra, 25 Cal.2d at p. 739, 155 P.2d 329.)
Because the right vindicated in Marinship was transparently clear and transcendingly *509 important, a right of constitutional stature, this court did not feel compelled to await action by the Legislature. "Some courts have held that state legislation is necessary in order to announce a public policy restricting a union's right to arbitrarily exclude individuals from membership although as a result thereof excluded persons are unable to find employment in their chosen trade. [Citations.] As said hereinbefore, however, other authorities have indicated that the courts, without statutory aid, may restrain such conduct by a union on the ground that it is tortious and contrary to public policy. Further, as said in 4 Restatement, Torts, page 136, comment to section 794: `The expression of public policy is not confined to legislation and criminal law; in passing upon the propriety of an object [of concerted labor action], public policy otherwise defined is an important factor. If the object is an act against which the law has definitely set its face, it is not a proper object of concerted action.'" (Marinship, supra, 25 Cal.2d at p. 734, 155 P.2d 329.)
History has confirmed this court's judgment that the racial discrimination practiced by the union in Marinship was "an act against which the law has definitely set its face." (Marinship, supra, 25 Cal.2d at p. 734, 155 P.2d 329.) However, it trivializes Marinship to suggest that anything like the same degree of public policy consensus has developed with regard to the question at bar. According to Dr. Potvin, the average physician who practices his specialty, obstetrics/gynecology, has been sued for malpractice 2.3 times. Metropolitan Life Insurance Company (MetLife) wishes to restrict its preferred provider lists to physicians with a slightly better than average malpractice history, to those who have not been sued more than twice. Potvin, by contrast, has been sued four timesnearly twice the average. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 500, 997 P.2d at p. 1156.) Now the majority's public policy antennae may be more sensitive than mine, but I suspect the jury is still out on the question of whether an insurer should be able to control its costs by restricting its preferred provider lists to physicians with slightly better than average malpractice histories. That, surely, is a business judgment, and if the insurer makes the wrong judgment by depriving itself of doctors that patients insist upon, then the market will punish the insurer and force it to retreat from the impracticable standard.
Far from having identified a practice "against which the law has definitely set its face" (Marinship, supra, 25 Cal.2d at p. 734, 155 P.2d 329), the majority condemns today what the Legislature is as likely as not to approve tomorrow. Indeed, in the 1995-1996 (Assem. Bill No. 3226) and 1997-1998 (Assem.Bill. No. 434) legislative sessions, attempts were made to pass laws granting physicians the sorts of procedural rights they receive under the majority opinion, and those bills failed. Colorado did recently pass legislation on this subject, but the Colorado Legislature must have consulted a different public policy oracle than did the majority of this court, for the Colorado statute permits a provider of health coverage to terminate a contract with a physician without cause so long as the notice requirements are the same for both parties. (Grossman v. Columbine Med. Group (Colo.Ct.App.) 12 P.2d 269.)

The Standard Announced by the Majority Is Unworkable
Under the standard announced by the majority, an insurer's obligation to provide a hearing to a physician removed from one of its preferred provider lists "arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial *510 economic interest." (Maj. opn., ante, 95 Cal.Rptr.2d at p. 504, 997 P.2d at p. 1160, fn. omitted.) Loss of income by the delisted physician, the majority adds, would be relevant insofar as it tended to prove that termination would "generally reduce physician income so significantly as to impair the ability to practice medicine." (Maj. opn., ante, at p. 505, 997 P.2d at p. 1161.)
My initial objection to the majority's standard is that it simply makes no sense. There is no necessary relationship between a physician's income and a physician's ability to practice medicine. Did Albert Schweitzer's ability to practice medicine diminish along with his income when he became a medical missionary in Africa?
Moreover, despite the majority's effort to cloak it in the public interest, this case has never been about Dr. Potvin's ability to practice medicine. It has been about money. In his initial correspondence with MetLife concerning his termination, Potvin expressed his grievance in strictly economic terms. "In this financial climate my being terminated from this program impedes to a degree my ability to make a living." In a letter written to MetLife a year later, Potvin reiterated that the termination "is causing me financial grief." In the complaint, which was filed a year after that, Potvin did not allege that his ability to practice medicine had been impaired, but rather that he had "lost a substantial amount of income, and will continue to lose substantial income each month." Finally, in moving for summary adjudication, Potvin repeated that the termination was causing him "financial grief." As far as we can tell from this record, during the three and a half years that passed between his initial correspondence with MetLife and the filing of his motion for summary adjudication, Potvin's ability to practice medicine and his medical specialty were unaffected. He just was not making as much money at it.
Now I am not saying that it is somehow unbecoming for physicians to be concerned about loss of income. What I am saying is that this court has made doctors a protected class. Until the economy turned around recently, one could hardly open a newspaper without reading of yet another company that had laid off thousands of its employees. However, no one suggested that textile workers or bank employees, for example, had a right to a hearing before losing their jobs. The layoffs certainly affected "important, substantial economic interests]" of theirs. (Maj. opn., ante, 95 Cal.Rptr.2d at p. 504, 997 P.2d at p. 1160.) Indeed, they may well have exhausted their savings and lost their homes. And yet textile workers and bank employees must fend for themselves, while doctors are treated by the majority as if they are entitled to a minimum income.
The standard announced by the majority is unworkable, too, in the sense that decisions under it will be unpredictable. As a consequence, insurers will be forced to forgo cost-cutting measures like MetLife's malpractice policy, or be prepared to grant hearings to all physicians terminated under such policies. The majority's standard purports to draw distinctions based on an insurer's share of the market in a particular geographic area. However, an insurer with any significant share of such a market will not be able to predict with confidence whether it would be found to possess "power so substantial" (maj. opn., ante, at p. 504, 997 P.2d at p. 1160) that termination from its preferred provider lists would "significantly impair[ ] the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area." (Ibid.) In theory, a physician in Riverside might be entitled to a hearing before being terminated by a given insurer, while a physician in Fremont might not be, but as a practical matter, denying the Fremont physician a hearing would only result in expensive litigation with an uncertain outcome, so the insurer will be forced to give them both *511 hearings. Or, more likely, the insurer wall simply give up on its cost-cutting efforts as not worth the candle because, as Justice Mosk pointed out in his dissent in Ezekial, "there will inevitably be constant court challenges to the nature of the `fair hearing.'" (Ezekial, supra, 20 Cal.3d 267, 282, 142 Cal.Rptr. 418, 572 P.2d 32 (dis. opn. of Mosk, J.).) That such an outcome, the abandonment of cost-control measures, would be in the public interest is certainly debatable, as inflation of health care costs is one of the greatest public policy challenges of our day. As Justice Mosk also pointed out in his dissenting opinion in Ezekial, "[w]hen we are importuned to judicially expand a common law concept we cannot overlook policy considerations and the practical repercussions." (Id. at p. 283, 142 Cal.Rptr. 418, 572 P.2d 32.)
The scope of the majority's opinion is also unclear. The majority insists that "[o]ur decision here does not apply to employer-employee contractual relations. Rather, it applies only to an insurer's decision to remove individual physicians from its preferred provider lists." (Maj. opn., ante, 95 Cal.Rptr.2d at p. 504, fn. 2, 997 P.2d at p. 1160, fn. 2.) However, employers will not be comforted, for why would the majority's opinion not apply to employer-employee contractual relations? Ezekial involved such relations. (See Ezekial, supra, 20 Cal.3d at p. 275, 142 Cal.Rptr. 418, 572 P.2d 32; id. at p. 276, 142 Cal.Rptr. 418, 572 P.2d 32 ["plaintiff, as a resident, is also necessarily an employee of the hospital"].) Moreover, assuming for the sake of argument that its opinion does not apply to employer-employee contractual relations, the majority will have created the anomalous situation that MetLife would have greater obligations to independent contractors like Potvin than to its own employees. For that matter, why would the majority's opinion not apply to the admission to, as well as the removal of physicians from, an insurer's preferred provider lists? After all, Pinsker involved admission to membership in national and state associations of orthodontists. A "public interest" having been shown, "the associations must be viewed as having a fiduciary responsibility with respect to the acceptance or rejection of membership applications." (Pinsker I, supra, 1 Cal.3d at p. 166, 81 Cal.Rptr. 623, 460 P.2d 495, italics added.)

The "Without Cause" Termination Provision in Dr. Potvin's Contract with MetLife Should Be Enforced
Dr. Potvin's contract with MetLife provided that it could be terminated by either party "`at any time, with or without cause, by giving thirty (30) days prior written notice to the other party'" (maj. opn., ante, 95 Cal.Rptr.2d at p. 499, 997 P.2d at p. 1155), and MetLife properly invoked that provision in terminating Potvin's preferred provider status. Therefore, as the majority notes, MetLife contends that even if removal of a physician from its preferred provider lists is subject to the common law right to fair procedure, Potvin waived that right by agreeing that MetLife could terminate the preferred provider arrangement without cause. In rejecting this contention, the majority declares the "without cause" termination provision of Potvin's contract with MetLife "unenforceable to the extent it purports to limit an otherwise existing right to fair procedure under the common law." (Maj. opn., ante, at p. 506, 997 P.2d at p. 1162.)
The analytical journey by which the majority comes to this remarkable conclusion is as abrupt as it is misconceived. After citing one out-of-state case, the majority contents itself with the observation that "California courts, too, are loathe to enforce contract provisions offensive to public policy. (Kreamer v. Earl (1891) 91 Cal. 112, 117, 27 P. 735 ["`No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication.' "]; accord, Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 381, 33 Cal.Rptr.2d 63, 878 *512 P.2d 1275.)" (Maj. opn., ante, 95 Cal. Rptr.2d at p. 506, 997 P.2d at pp. 1161-1162.)
To the contrary: "Historically, this court has been reluctant to declare contractual provisions void or unenforceable on public policy grounds without firm legislative guidance." (Santisas v. Goodin (1998) 17 Cal.4th 599, 621, 71 Cal.Rptr.2d 830, 951 P.2d 399.) Insofar as the Legislature has provided guidance on the subject of at-will termination provisions, and it has in the context of employment contracts, it has made such provisions generally enforceable. "An employment, having no specified term, may be terminated at the will of either party on notice to the other." (Lab.Code, § 2922.) In Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, this court created a narrow exception to this rule by recognizing that an employer's right to discharge an at-will employee is subject to limits that fundamental public policy imposes. However, as we subsequently explained, employees who assert Tameny claims must show that the important public interests they seek to protect are "tethered to fundamental policies that are delineated in constitutional or statutory provisions." (Gantt v. Sentry Insurance, supra, 1 Cal.4th at p. 1095, 4 Cal. Rptr.2d 874, 824 P.2d 680 (Gantt).) The reason for our reticence is clear. "[T]he policy of the state is not created by the judicial department, although the judicial department may be called upon at times to declare it; it can be ascertained only by reference to the constitution and laws passed under it, or, which is the same thing, to the principles underlying and recognized by the constitution and laws." (Lux v. Hoggin (1886) 69 Cal. 255, 307-308, 4 P. 919.) "[M]any courts have cautioned against recklessness in condemning contracts as being against public policy. Thus it has been said by an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths." (Southern Pacific R.R. Co. v. Stibbens (1930) 103 Cal.App. 664, 680, 285 P. 374.)
So what authority does the majority rely upon in impliedly repudiating this cardinal principle of judicial restraint? A 110-year-old caseKreamer v. Earl, supra, 91 Cal. 112, 27 P. 735 (Kreamer). Actually, Kreamer looked to the Constitution and statutes of this state in determining that it would be contrary to public policy to enforce a land sale contract. The contract was in contravention of the state constitutional provision that "`lands belonging to this state which are suitable for cultivation shall be granted only to actual settlers, and in quantities not exceeding 320 acres to each settler.'" (Id, at pp. 117-118, 27 P. 735.) "There is no doubt that the contract contravenes the spirit and policy of the land laws of this state.... It is not necessary that the act itself, or any other act, should declare in express words such a contract to be void. If, upon a review of all the state legislation upon the subject, such a contract appears to contravene the design and policy of the laws, a court of equity will not enforce it." (Id. at pp. 116-117, 27 P. 735.) It was in this context that the Kreamer court made the statement upon which the majority relies. "`No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication.'" (Damrell v. Meyer [(1870)] 40 Cal. [166,] 170 [1870 WL 889].)" (Id. at p. 117, 27 P. 735.) Parenthetically, I do not tax the majority with the error, but as a matter of editorial curiosity, the statement that the Kreamer court purports to quote from Damrell v. Meyer nowhere appears in Damrell. More substantively, I note that Damrell refused to enforce a contract that it found to be "in direct contravention of the express provision of the Pre-emption Act." (Damrell, supra, 40 Cal. at p. 170.) Damrell, then, like Kreamer, is perfectly consistent with the principle that the majority now repudiatesthat a court should not refuse to enforce a contract as being contrary to public policy unless that policy is *513 clearly expressed in constitutional or statutory provisions.
The out-of-state case upon which the majority relies is Harper v. Healthsource New Hampshire, Inc. (1996) 140 N.H. 770, 674 A.2d 962 (Harper). (Maj. opn., ante, 95 Cal.Rptr.2d at p. 506, 997 P.2d at p. 1161.) Upon examination, Harper provides little support for the majority's refusal to enforce the "without cause" termination clause of Potvin's contract with MetLife. Harper is distinguishable because California law differs from New Hampshire's in three respects that are critical to the decision in that case. First, the New Hampshire Supreme Court has "carved out exceptions to the common law employment-at-will doctrine, noting that in some cases `the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two.' [Citations.]" (Harper, supra, 674 A.2d at pp. 964-965.) In California, on the other hand, the common law employment-at-will doctrine has been reinforced by statute (Lab.Code, § 2922), and this court has not "carved out" the exception upon which the Harper court relied. Second, in New Hampshire "[t]he public policy to which a court may refer [in refusing to enforce a contract] may be statutory or nonstatutory in origin." (Harper, supra, 674 A.2d at p. 965.) By contrast, this court, as I have just explained, is generally "reluctant to declare contractual provisions void or unenforceable on public policy grounds without firm legislative guidance" (Santisas v. Goodin, supra, 17 Cal.4th at p. 621, 71 Cal.Rptr.2d 830, 951 P.2d 399), and we have specifically held that exceptions to the employment-at-will doctrine must be "tethered to fundamental policies that are delineated in constitutional or statutory provisions" (Gantt, supra, 1 Cal.4th at p. 1095, 4 Cal.Rptr.2d 874, 824 P.2d 680). Third, Harper relied upon an expression of policy by the New Hampshire Legislature "that preferred provider agreements must be `fair and in the public interest.'" (Harper, supra, 674 A.2d at p. 966.) No similar expression of policy by the California Legislature has been brought to our attention.
Finally, the Harper court emphasized that the rule it was declaring "does not eliminate a health maintenance organization's contractual right to terminate its relationship with a physician without cause." (Harper, supra, 674 A.2d at p. 966.) Rather, under the Harper rule, a physician terminated pursuant to a "without cause" provision is entitled to review only if "the physician believes that the decision to terminate was, in truth, made in bad faith or based upon some factor that would render the decision contrary to public policy." (Ibid.) Indeed, under the Harper rule, the "without cause" termination provision of MetLife's contract with Dr. Potvin should be enforced because there is no showing that MetLife's decision was "made in bad faith or based upon some other factor that would render the decision contrary to public policy." (Ibid.)
Certainly it is not contrary to public policy for a business enterprise to seek to minimize its costs. Any successful business must do so, and in this era of spiraling health care costs, health care providers have a special societal responsibility to do so. (In enacting the Knox-Keene Health Care Service Plan Act of 1975 (Stats.1975, ch. 941, § 2, p. 2071), for example, the Legislature stated that one of its goals was providing "the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers." (Health & Saf.Code, § 1342, subd. (d), italics added.)) For a medical insurer, physician services are one of its principal costs, and for physicians, malpractice insurance is one of their principal costs. Therefore, to be competitive, a medical insurer would be wise to restrict its preferred provider lists to physicians with better than average malpractice histories, and, by his own admission, Dr. Potvin's malpractice history was considerably worse than average.
*514 In conclusion, the judgment of the trial court granting MetLife's motion for summary judgment should have been affirmed.
BAXTER, J., and CHIN, J., concur.
NOTES
[*] Baxter, J., Chin, J., and Brown, J., dissented.
[1] A threshold issue MetLife raised in its petition for review is whether Potvin's complaint alleged any claim for violation of the common law right to fair procedure. As we have noted in the text, the first cause of action bore the heading "Violation of Business and Professions Code section 805 et seq. and for Violation of Fair Procedure." (Italics added.) The body of the complaint alleged: "By removing plaintiff from the defendants' Provider List, defendants deprived plaintiff of a vested property right without a hearing. It did so in violation of due process of law and by depriving the plaintiff of fair procedure." (Italics added.) We agree with the Court of Appeal that "despite the inartful pleading," the complaint does allege a violation of the right to fair procedure.

Because both the trial court and the Court of Appeal rejected Potvin's claim of entitlement to a hearing under Business and Professions Code section 805, MetLife did not raise that issue in its petition for review. We decline Potvin's request that we nonetheless consider it in exercising our discretion to hear "any or all issues in the cause." (Cal. Rules of Court, rule 29.2(a).)
[2] Our decision here does not apply to employer-employee contractual relations. Rather, it applies only to an insurer's decision to remove individual physicians from its preferred provider lists. We express no view on whether the factors giving rise to the common law right of fair procedure would be present when an insurer, acting to limit its service in a geographic area or medical field, reduces the total number of physicians on its preferred provider lists.
[3] Physicians on defendant MetLife's preferred provider lists are not its employees. Thus, this case does not raise an issue that is subject to Labor Code section 2922, which states:

"An employment, having no specified term, may be terminated at the will of either party on notice to the other."